## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL AIR TRAFFIC CONTROLLERS          :
ASSOCIATION, AFL-CIO,                     :
1325 Massachusetts Ave, N.W.              :
Washington, D.C. 20005,                   :
                                          :
                    Plaintiff,            : Civil Action No. 1:08-cv-00481 .
                                          : Assigned to Collyer, Rosemary M.
        vs.                               : Assign. Date: 3/21/2008
                                          : Description: Admn. Agency Review
FEDERAL LABOR RELATIONS AUTHORITY, :
1400 K Street, N.W.                       :
Washington, D.C. 20424,                   :
                                          :
                                          :
FEDERAL SERVICE IMPASSES PANEL            :
1900 E Street, N.W.                       :
Washington, DC   20415,                   :
                                          :
                                          :
and                                       :
                                          :
UNITED STATES DEPARMENT OF                :
TRANSPORTATION,                           :
FEDERAL AVIATION ADMINISTRATION           :
800 Independence Avenue, SW               :
Washington, DC   20591,                   :
                                          :
                    Defendants.           :
_____       :

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, LCvR 7, and LCvR

56.1, upon the Complaint filed in this action, the accompanying Memorandum of Law,

Statement of Material Facts Not In Dispute, and Declaration of Patrick Forrey, Plaintiff

National Air Traffic Controllers Association, AFL-CIO ("NATCA" or "the Union"), by its

undersigned counsel, respectfully moves this Court for the entry of summary

judgment.  A Proposed Order granting the relief requested accompanies this motion.

Respectfully submitted,

William W. Osborne, Jr.
D.C. Bar Identification No. 912089
Marie Louise Hagen
D.C. Bar Identification No. 412411
Osborne Law Offices, P.C.
4301 Connecticut Avenue, N.W.
Suite 108
Washington, D.C. 20008
(202) 243-3200

Marguerite L. Graf
D.C. Bar Identification No. 455693
General Counsel
National Air Traffic Controllers
Association, AFL-CIO
1325 Massachusetts Avenue, N.W.
Washington, D.C. 20005
(202) 628-5451
Counsel for Plaintiff

Dated:  May 1, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL AIR TRAFFIC CONTROLLERS
ASSOCIATION, AFL-CIO,
1325 Massachusetts Ave, N.W.
Washington, D.C. 20005,

                    Plaintiff,

    vs.

FEDERAL LABOR RELATIONS AUTHORITY,
1400 K Street, N.W.
Washington, D.C. 20424,

FEDERAL SERVICE IMPASSES PANEL
1900 E Street, N.W.
Washington, DC  20415,

and

UNITED STATES DEPARMENT OF
TRANSPORTATION,
FEDERAL AVIATION ADMINISTRATION
800 Independence Avenue, SW
Washington, DC  20591,

                  Defendants.

Civil Action No. 1:08-cv-00481 .
Assigned to Collyer, Rosemary M.
Assign. Date: 3/21/2008
Description: Admn. Agency Review

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE DISPUTE

### Introduction

Pursuant to Rule 56(e) of the Federal Rules of Civil Procedure and Rule 56.1 of the

Local Rules of this Court, Plaintiff National Air Traffic Controllers Association, AFL-CIO,

respectfully submits this Statement of Undisputed Facts in support of its Motion for

Summary Judgment.

## Undisputed Facts

1.  The Plaintiff National Air Traffic Controllers Association, AFL-CIO ("NATCA" or "the Union") is a "labor organization" within the meaning of 5 U.S.C. §7103(a)(4) of the Civil Service Reform Act of 1978 ("CSRA") whose members are employees of he Federal Aviation Administration ("FAA" or "the Agency").   Pursuant to the CSRA's representation processes, NATCA has been certified as the "exclusive representative" for purposes of collective bargaining in numerous bargaining units of FAA employees, including the largest of such bargaining units inclusive of over 12,000 FAA air traffic control specialists

2.  The Defendant U.S. Department of Transportation, Federal Aviation Administration, is the federal governmental agency responsible, *inter alia*, for the regulation and control of air commerce and air traffic in the airspace of the United States and is a "federal agency" for purposes of the CSRA.  5 U.S.C. §7103(a)(4).

3.  The Defendant Federal Labor Relations Authority ("FLRA" or "the Authority") is the agency of the United States government established by Congress, under 5 U.S.C. §7104(a), to administer the CSRA.

4.  The Defendant Federal Service Impasses Panel ("FSIP" or "the Panel") is "an entity within the [Federal Labor Relations] Authority," established by Congress under 5 U.S.C. 7119, to exercise jurisdiction, upon proper application, over *bona fide* collective bargaining negotiation impasses, to "provide assistance in the resolving of negotiation impasses between agencies and exclusive representatives."

5.  Between 1987, the time of NATCA's initial certification by the FLRA as the exclusive representative of the FAA's air traffic control specialists, and 2005, NATCA and

2

the FAA (i) engaged collective bargaining negotiations over a full range of issues that are

bargainable under the CSRA, including bargaining over compensation and benefit issues

in 1998 and thereafter; and (ii) without any negotiation impasses, NATCA and the FAA

reached mutually acceptable collective bargaining agreements in 1989, 1993, 1998, and

2003, and extended their 2003 agreement to 2005. *See* Exhibit A to the Declaration of

Patrick Forrey, November 8, 1999, Memorandum of Understanding With Respect To

Reclassification and Associated Pay Rules Between NATCA and The FAA , annexed

hereto.

      6.  On November 15, 1995, Congress directed the FAA to develop a personnel

management system to take the place of Title 5 of the U.S. Code and the other federal

statutory personnel laws that otherwise establish the basic personnel management

system for all of the federal government's departments and agencies:

> [N]otwithstanding the provisions of title 5, United States Code, and other
> Federal personnel laws [other than the seven sets of statutory provisions
> specified in § 347(b)], the Administrator of the Federal Aviation Adminis-
> tration shall develop and implement a personnel management system for
> the Federal Aviation Administration that addresses the unique demands on
> the agency's workforce.

Pub. L. No. 104-50, §347, 109 Stat. 436, 460 (1995) ("DOT Act").

      7.  On March 28, 1996, in response to Congress' directive, the FAA Administrator

adopted the FAA Personnel Management System ("FAA PMS").  The FAA PMS is

organized in Chapters, addressing respectively FAA Staffing, Compensation,

Performance Management, Training, Labor Relations and Executive Systems.  (*Avail-

able at* https:// employees.faa.gov/org/staffoffices/ahr/policy_guidance/hr_policies/

PMS/personnel/).  With regard to collective bargaining, the FAA PMS Chapter V, "Labor

3

Relations," provides that:

> [t]he FAA, all FAA employees, and all labor organizations representing FAA
> employees shall have the same rights, and be subject to the same
> responsibilities and limitations as are available to all Federal agencies,
> employees and labor organizations under 5 U.S.C. Chapter 71.

The foregoing provision has remained intact as a part of the FAA PMS from its inception

in 1996 to the present time.

8. On March 29, 1996, the day after the FAA PMS was implemented, Congress,

by Joint Resolution 170, amended §347(b) of the DOT Act -- the provision that lists the

sets of statutory requirements the FAA PMS must incorporate -- to add to the list of

provisions to be included in the FAA PMS "chapter 71, relating to labor-management

relations." H.R.J. Res. 170, Pub. L. No. 104-122 §347(b), 110 Stat. 876 (1996). 49

U.S.C.§§ 40122(g)(2)(e).

9. (a) On October 9, 1996, Congress, in Section 40122(a) of Title 49, established

a process the FAA was required to follow in "making changes" to the FAA PMS:

> (1)    Consultation and Negotiation. In developing and making changes to
> the personnel management system initially implemented by the
> Administrator of the Federal Aviation Administration ..., the Administrator
> shall negotiate with the exclusive bargaining representatives of employees
> of the Administration ... and consult with other employees of the
> Administration.
>
> (2)    Mediation. If the Administrator does not reach an agreement under
> paragraph (1) with the exclusive bargaining representatives, the services of
> the Federal Mediation and Conciliation Service shall be used to attempt to
> reach such agreement. If the services of the Federal Mediation and
> Conciliation Service do not lead to an agreement, the Administrator's
> proposed change to the personnel management system shall not take
> effect until 650 days have elapsed after the Administrator has transmitted
> the proposed change, along with the objections of the exclusive bargaining
> representatives to the change, and the reasons for such objections, to
> Congress. The 60-day period shall not include any period during which
> Congress has adjourned sine die.

4

49 U.S.C.§§ 40122 (a)(1),(2).  The FAA (i) has never published any proposed "changes" to the FAA PMS; (ii) has never requested negotiations "with the exclusive bargaining representatives" regarding such "changes;" and (iii) has never submitted proposed "changes" to the FAA PMS to Congress.

(b)     At the same time, Congress amended Section§106(*l*) to provide:

> Officers and employees.  Except as provided in subsections (a) and (g) of section 40122, the Administrator is authorized … to appoint, Transfer, and fix the compensation of such officers and employees, including attorneys as may be necessary to carry our the functions of the Administrator and the Administration.  In fixing compensation and benefits of officers and employees, the Administrator shall not engage in any type of bargaining, except to the extent provided for in section 40122(a), nor shall the Administrator be bound by any requirement to establish such benefits at particular levels.

49 U.S.C. §106(*l*).  The subsection in Section 106(l) referring to "subsection [ ] … (g) of section 40122" incorporated the requirement that the FAA PMS include "chapter 71, relating to labor-management relations." 49 U.S.C.§§ 40122(g)(2)(e).

10.  Beginning In 2005 and continuing to date, the FAA has opposed NATCA's invocation of the FSIP's impasse-resolution jurisdiction on the claim that Congress' enactment of 49 U.S.C. §§ 40122(a) and 106(*l* ) respectively had the effect of implicitly divesting the FSIP of its jurisdiction over collective bargaining negotiation impasses between the FAA and labor organizations representing its employees.   Specifically, the FAA has claimed that the process established by Congress in Section 40122(a) for making "changes" to the FAA PMS governs the resolution of negotiation impasses in collective bargaining as well and/or that the authority granted the FAA Administrator in Section 106(*l* ) to "fix the compensation of … [FAA] employees" had the effect of

5

divesting the FSIP of its impasse-resolution jurisdiction over that subject.

As a result, the FSIP has on two occasions refused to take jurisdiction over impasses between the FAA and NATCA:

(a) On July 8, 2003, NATCA invoked the FSIP's impasse-resolution jurisdiction with regard to negotiation impasses in collective bargaining between NATCA and the FAA for initial collective bargaining agreements covering eleven (11) non-air traffic controller bargaining units represented by NATCA. The FAA objected, and on January 9, 2004, the FSIP declined to exercise its jurisdiction over the impasses, and declined to take a position on the merits of the jurisdictional issue, on the ground that "Congress' intent in enacting [the] statutory provisions [cited by the FAA] is subject to conflicting interpretations, [that] must be addressed in [and resolved by some other] appropriate forum." *See* Exhibit B to the declaration of Patrick Forrey, annexed hereto.

(b) On April 5, 2006, the FAA declared a negotiation impasse in the collective bargaining between NATCA and the FAA for a successor collective bargaining agreement covering the bargaining unit, inclusive of over 12,000 FAA air traffic control specialists. *See* Exhibit C to the declaration of Patrick Forrey, annexed hereto. On April 7, 2006, NATCA invoked the impasse-resolution jurisdiction of the FSIP with regard to that negotiation impasse. *See* Exhibit D to the declaration of Patrick Forrey, annexed hereto. The FAA again objected and, on July 6, 2006, the FSIP again declined to exercise its jurisdiction over the impasse, and declined to take a position on the merits of the jurisdictional issue, on the ground that "Congress' intent in enacting [the] statutory provisions [cited by the FAA is] subject to conflicting interpretations, [that] must be addressed in [and resolved by some other] appropriate forum." *See* Exhibit E to the

6

declaration of Patrick Forrey, annexed hereto.

11.  On January 30, 2004, following the FSIP's initial refusal to exercise its mandate over the impasses in collective bargaining between NATCA and the FAA in 2003, *see* ¶ 10(a), *supra*, NATCA filed a lawsuit in the U.S. District Court for the District of Columbia to require the FSIP to exercise its impasse-resolution jurisdiction with regard to the negotiation impasses between the FAA, NATCA and one other labor organization representing FAA employees.  *See* National Air Traffic Controllers Association, AFL-CIO and Professional Airways Systems Specialists, AFL-CIO v. Federal Service Impasses Panel and Federal Labor Relations Authority, Case No.04CV00138.  The District Court dismissed the action, holding that the FLRA is "the better forum to decide whether the FAA is required to follow the entire impasse-resolution process of Chapter 71 for these particular impasses." Nat'l Air Traffic Controllers Ass'n. v. Federal Services Impasses Panel, et al., 2005 U.S. Dist. LEXIS 2964 at *14 (D.D.C. 2004).   The Court of Appeals for the D.C. Circuit affirmed on the same basis.  Nat'l Air Traffic Controllers Ass'n. v. Federal Service Impasses Panel, et al., 437 F.3d 1256, 1265 (D.C. Cir. 2006).

12.  NATCA has twice attempted to cause the issue of the FSIP's impasse-resolution jurisdiction over negotiation impasses in the collective bargaining process between the FAA and NATCA to be presented to the FLRA, as directed by this Court and by the D.C. Circuit, but has been prevented from doing so:

(a)  On July 8, 2005, amended on July 14, 2005, NATCA filed FLRA unfair labor practice charges raising the FSIP jurisdictional issue against the FAA.  On September 29, 2006, those unfair labor practice charges were administratively dismissed by the FLRA's General Counsel, at the urging of the FAA and over NATCA's objections, on the

basis of a unilateral settlement agreement between the FAA and the General Counsel. As a result of that settlement, the issue of the FSIP's impasse-resolution jurisdiction over negotiation impasses in collective bargaining between the FAA and labor organizations representing the Agency's employees was not and could not be presented to the FLRA.

(b)  On July 11, 2006, and again on September 6, 2006, NATCA filed FLRA unfair labor practice charges raising the FSIP jurisdictional issue against the FAA.  On July 25, 2007, NATCA's charges were administratively dismissed by the San Francisco Regional Office of the FLRA General Counsel, at the urging of the FAA and over NATCA's objection.  As a result of that dismissal, the issue of the FSIP's impasse-resolution jurisdiction over negotiation impasses in collective bargaining between the FAA and labor organizations representing the Agency's employees was not, and could not be, presented to the FLRA *See* July 25, 2007 dismissal letter from the FLRA Regional Office; January 29, 2008, affirmance of that dismissal by the General Counsel of the FLRA and February 26, 2008, denial of NATCA's request for reconsideration of that dismissal.  See Exhibits F, G and H to the declaration of Patrick Forrey, annexed hereto.

13.  The FSIP has twice refused to exercise its impasse-resolution jurisdiction over negotiation impasses between the FAA and labor organizations representing its employees, and has done so without addressing the merits of that jurisdictional issue, on the ground that it will not do so unless and until the FAA's claim, that Congress in 1996 divested the FSIP of its impasse-resolution jurisdiction over negotiation impasses between the FAA and labor organizations representing its employees,  is resolved by some other "appropriate forum."  The FSIP may reasonably be expected to hold to that refusal in the future, in the absence of such an appropriate forum's decision. *See* ¶ 10,

8

*supra.*

14.  The FSIP jurisdictional issue has evaded review by the FLRA since at least 2005 and reasonably may be expected to continue to evade FLRA review in the future. *See* ¶ 12, *supra.*

                                        Respectfully submitted,


                                        *William W Osborne*

                                        William W. Osborne, Jr.
                                        D.C. Bar Identification No. 912089
                                        Marie Louise Hagen
                                        D.C. Bar Identification No. 412411
                                        Osborne Law Offices, P.C.
                                        4301 Connecticut Avenue, N.W.
                                        Suite 108
                                        Washington, D.C. 20008
                                        (202) 243-3200

                                        *Marguerite L. Graf / WWO Jr.*

                                        Marguerite L. Graf
                                        D.C. Bar Identification No. 455693
                                        General Counsel
                                        National Air Traffic Controllers
                                        Association, AFL-CIO
                                        1325 Massachusetts Avenue, N.W.
                                        Washington, D.C. 20005
                                        (202) 628-5451
                                        Counsel for Plaintiff

Dated: May 1, 2008

                                        9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL AIR TRAFFIC CONTROLLERS                :
ASSOCIATION, AFL-CIO,                                        :
1325 Massachusetts Ave, N.W.                              :
Washington, D.C. 20005,                                       :
                                                                           :
                              Plaintiff,                            : Civil Action No. <u>1:08-cv-00481</u> .
                                                                           : Assigned to Collyer, Rosemary M.
             vs.                                                      : Assign. Date: 3/21/2008
                                                                           : Description: Admn. Agency Review
FEDERAL LABOR RELATIONS AUTHORITY,    :
1400 K Street, N.W.                                             :
Washington, D.C. 20424,                                     :
                                                                           :
FEDERAL SERVICE IMPASSES PANEL           :
1900 E Street, N.W.                                             :
Washington, DC   20415,                                     :
                                                                           :
and                                                                    :
                                                                           :
UNITED STATES DEPARMENT OF                    :
TRANSPORTATION,                                             :
FEDERAL AVIATION ADMINISTRATION            :
800 Independence Avenue, SW                          :
Washington, DC   20591,                                     :
                                                                           :
                              Defendants.                       :
_____ :

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF SUMMARY JUDGMENT**

Plaintiff National Air Traffic Controllers Association, AFL-CIO ("NATCA" or "the

Union"), by its undersigned counsel, respectfully submits this memorandum of law in

support of its motion for summary judgment.[1]

_____

[1] Plaintiff submits herewith its Statement of Material Facts As To Which There Is No Genuine Dispute
(hereinafter "Pl. St.").

## STATEMENT OF THE CASE

The Civil Service Reform Act of 1978 ("CSRA") provides -- in place of a right of the parties to collective bargaining to use economic force to resolve an impasse in the negotiation of a collective bargaining agreement -- a right of the federal parties to such negotiations to invoke the mandatory impasse-resolution jurisdiction of the Federal Service Impasses Panel ("FSIP" or "the Panel") as the "last resort in the speedy resolution of [collective bargaining] disputes after negotiations have failed." Council of Prison Locals v. Brewer, 735 F.2d 1497, 1501 (D.C. Cir. 1984).  Pl. St. ¶ 4.

Since 2005, the Federal Aviation Administration ("FAA" or "the Agency") has succeeded in negating that right by making the claim that Congress, by enacting 49 U.S.C. §§ 40122(a) and 106(l) in 1996, implicitly divested the FSIP of its impasse-resolution jurisdiction over negotiation impasses in collective bargaining between the FAA and labor organizations representing the Agency's employees.  As a result, the FSIP has twice refused to exercise its jurisdiction over such negotiation impasses, and has done so without deciding the FAA's claims, pending a statutory interpretation and ruling on the effect of Sections 40122(a) and 106(l) on the Panel's impasse-resolution jurisdiction by some other "appropriate forum." Pl. St. ¶ 10. [2]  And on both occasions the efforts by NATCA to secure such a ruling from the Federal Labor Relations Authority ("FLRA" or "the Authority") have proved unavailing.  Pl. St. ¶ 12.

By this declaratory judgment action, NATCA now seeks such a statutory

---

[2] In 2004, suit was filed to require the FSIP to exercise its jurisdiction over existing collective bargaining impasses, but the Court declined to resolve the question at that time, holding that the FLRA was "the better forum to decide whether the FAA is required to follow the entire impasse-resolution process of Chapter 71 for these particular impasses," Nat'l Air Traffic Controllers, et al. v. Federal Services Impasses Panel, et al. 2005 U.S. Dist. LEXIS 2964 at *14 (D.D.C. 2004), aff'd Nat'l Air Traffic Controllers Ass'n v. Federal Service Impasses Panel, et al., 437 F.3d 1256, 1265 (D.C. Cir. 2006).  Pl. St. ¶ 11.

interpretation and ruling from this most "appropriate forum" on the meaning of

Sections 40122(a) and 106(*l*) and on those statutory provisions' effect on the FSIP's

jurisdiction over negotiation impasses in collective bargaining between the FAA and

labor organizations representing the Agency's employees.

## ARGUMENT

### 1. Declaratory Judgment Is Appropriate In This Case

The Court has jurisdiction, and authority under 28 U.S.C. §2201, to render a

declaratory judgment to resolve a question of law with regard to the jurisdiction of a

federal agency.  Florida Board of Business Regulation v. NLRB, 686 F. 2d 1362,

1368-69 (11th Cir. 1982) (declaratory judgment resolving jurisdiction of the NLRB over

a particular category of employees); Lipscomb v. FLRA, 200 F.Supp. 2d 650, 656 (D.

Miss. 1971), aff'd 333 F.2d 611 (5th Cir. 1971), *cert. denied* 405 U.S. 996 (1972)

(declaratory judgment resolving jurisdiction of the FLRA over National Guard

employees); Nat'l Automatic Laundry and Cleaning Council v. Shultz, 443 F.2d 689

(D.C. Cir. 1971) (declaratory judgment resolving wage and hour jurisdiction of the DOL

over coin-operated laundries).   See also Terminal Freight Handling Co. v. Solein, 444

F. 2d 699, 703-05 (8th Cir. 1971), *cert. denied* 405 U.S. 996 (1972) (declaratory

judgment resolving authority of NLRB General Counsel to decline to institute injunctive

proceedings under 29 U.S.C. § 160(l)).

The compelling circumstances of this case warrant the issuance of a

declaratory judgment.  This case presents a pure question of law that turns on "such

materials as the law and its legislative history," Nat'l Automatic Laundry, *supra,* 443

F.2d at 695; that " … is not contingent, has not evaporated or disappeared and, by its

3

continuing and brooding presence, casts what  may be a substantial adverse effect on

the interests of the petitioning parties," Super Tire Engineering Co. v. McCorkle, 416

U.S. 115, 122 (1974); and that will inevitably recur in the future, PETA v. Gittens, 396

F.3d  416, 423 (D.C. Cir. 2005).

It is particularly to the point in that regard that the FSIP, the federal agency

whose jurisdiction is in issue, has twice refused to decide that purely legal issue in

deference to a decision by some other "appropriate forum," and that the FLRA has

proved to be unavailable as such a forum.

### 2.    The FSIP Has Jurisdiction Over Collective Bargaining Impasses Between the FAA and Labor Organizations Representing the Agency's Employees

It is plain on the face of the CSRA, 5 U.S.C. § 7119, and on the face of Chapter

V of the FAA PMS, which explicitly makes the CSRA fully applicable to collective

bargaining between the FAA and labor organizations representing the Agency's

employees, that the FSIP has mandatory impasse-resolution jurisdiction over

negotiation impasses in collective bargaining between the FAA and labor

organizations representing the Agency's employees.  It is equally plain that neither

Section 40122(a) nor Section 106(*l*) of Title 49 divested the FSIP of that jurisdiction.

### (a)    The FSIP's Jurisdiction

Section 7119 of the CSRA establishes the impasse-resolution jurisdiction

of the FSIP and provides that that the Panel "shall provide services and assistance to

agencies and exclusive representatives in the resolution of negotiation impasses," 5

U.S.C. § 7119(a), and that, in the event of a *bona fide* impasse in collective bargaining

negotiations, and a proper application to the FSIP, "[t]he  Panel … shall promptly

4

investigate any impasse presented to it... and shall either (i) recommend to the parties procedures for resolution of the impasse" or (ii) assist the parties in resolving the impasse through whatever methods and procedures ... [the Panel] may consider appropriate to accomplish the purpose of this section." 5 U.S.C. §§ 7119(c)(5)(a)(i),(ii).

In sum, Congress, in regulating the collective bargaining process for federal agencies and labor organizations representing federal employees, provided, that, when a federal agency and a labor organization representing that agency's employees are engaged in the process of good faith collective bargaining negotiations for an agreement governed by the CSRA  and reach a *bona fide* impasse in their bargaining, and one of the parties makes a proper application to the FSIP, the Panel is to take jurisdiction over the negotiation impasse in order to " ...resolv[e] the impasse through whatever methods and procedures... [the Panel] considers appropriate."  Id.

Moreover, the explicit terms of Chapter V, Labor Relations, of the FAA PMS, as adopted by the FAA in 1996 and maintained to the present time, make it crystal clear that the FSIP has the same impasse-resolution jurisdiction over negotiation impasses in collective bargaining between the FAA and labor organizations representing FAA employees as the Panel has over negotiation impasses in collective bargaining between all other federal agencies and labor organizations representing the agencies' employees under the CSRA.  The FAA PMS does so by providing that the collective bargaining procedures and requirements are the same for the FAA and labor organizations representatives as for "all other Federal agencies ... and labor organizations under 5 U.S.C. Chapter 71. PMS, Chapter V, Labor Relations." Pl. St. ¶ 7.

5

Indeed, that section of the FAA PMS has since been made mandatory by Congress, in 5 U.S.C. §40122(g)(2)(e) which requires the FAA to incorporate in the FAA PMS "...chapter 71, relating to labor-management relations[ ]", i.e., the CSRA in its entirety to govern the collective bargaining process between the FAA and labor organizations representing the Agency's employees. Pl. St. ¶ 8.

### (b) Congress Has Not Divested the FSIP of Its Impasse-Resolution Jurisdiction Over Negotiation Impasses Between the FAA and Labor Organizations Representing the Agency's Employees

Contrary to the FAA's claims, neither Section 40122(a) nor Section 106(*l*) of Title 49 divests the FSIP of its mandatory impasse-resolution jurisdiction over negotiation impasses between the FAA and labor organizations representing the Agency's employees.  Indeed, neither provision has any application whatsoever to the traditional process of collective bargaining between the FAA and labor organizations representing the Agency's employees which, both before and after the enactment of Sections 40122(a) and 106(*l*), is governed exclusively by the provisions of the CSRA.

(i)  Section 40122(a) provides as follows:

(1) …  In developing and making changes to the personnel management system initially implemented by the Administrator of the Federal Aviation Administration …, the Administrator shall negotiate with the exclusive bargaining representatives of employees of the Administration … and consult with other employees of the Administration.

(2) …  If the Administrator does not reach an agreement under paragraph (1) with the exclusive bargaining representatives, the services of the Federal Mediation and Conciliation Service shall be used to attempt to reach such agreement.  If the services of the Federal Mediation and Conciliation Service do not lead to an agreement, the Administrator's proposed change to the personnel management system shall not take effect until 650 days have elapsed after the Administrator has transmitted the proposed change, along with the objections of the exclusive bargaining representatives to the change, and the reasons for such objections, to Congress…

The FAA PMS, as promulgated by the Agency in 1996, and as codified by Congress thereafter, sets out the FAA's Personnel Management System – arranged in Chapters addressing respectively FAA Staffing, Compensation, Performance Management, Training, Labor Relations and Executive Systems – through a series of provisions that take the place of, or incorporate, a provision of Title V of the U.S. Code and the other federal statutory provisions governing personnel matters.

The sole office of Section 40122(a) is to establish the process for the FAA in "developing and making changes" to *that FAA PMS*. In concrete terms, what Section 40122(a) details the procedures the FAA must follow in adding to, deleting or amending one or more of the provisions set forth in the FAA PMS as originally promulgated in 1996. To date, the FAA has never felt the need to invoke these procedures for their intended purpose for the FAA has never proposed, let alone sought to implement a single "change" to the FAA PMS -- it remains verbatim today as published in 1996. Pl. St. ¶ 9.

That is fatal to the FAA's claim that Section 40122(a) somehow divested the FSIP of its impasse-resolution jurisdiction over negotiation impasses in collective bargaining between the FAA and labor organizations representing FAA employees. The process by which the FAA and such labor organizations negotiate and consummate collective bargaining agreements, as provided in the CSRA, is most certainly *not* a process for "developing or making changes" to the FAA PMS itself.

For the FAA PMS, Chapter V, Labor Relations , expressly authorizes collective bargaining between the FAA and labor organizations representing Agency employees

7

under the procedures and requirements of the CSRA -- the same procedures and requirements that govern "all other Federal agencies ... and labor organizations under 5 U.S.C. Chapter 71." Pl. St. ¶ 7. When the FAA and labor organizations representing the Agency's employees engage in collective bargaining covered by the CSRA they are acting under the authority provided by the FAA PMS and effectuating its precise terms -- they are not doing anything that can be characterized as "developing or making changes" to the PMS itself.

Thus, Section 40122(a), which by its terms applies to the process for "developing or making changes" to the FAA PMS, has no application to any aspect of the process of collective bargaining between the FAA and labor organizations representing FAA employees whether it be the actual negotiation of bargainable subjects or the resolution of a *bona fide* impasse in such negotiations by the FSIP.

(ii)  In amending Section 106(*l*), Congress in turn provided:

> Officers and employees.  Except as provided in subsections (a) and (g) of section 40122, the Administrator is authorized ... to appoint, transfer, and fix the compensation of such officers and employees, including attorneys as may be necessary to carry our the functions of the Administrator and the Administration.  In fixing compensation and benefits of officers and employees, the Administrator shall not engage in any type of bargaining, except to the extent provided for in section 40122(a), nor shall the Administrator be bound by any requirement to establish such benefits at particular levels.

49 U.S.C. §106(*l*). Congress thereby granted the FAA Administrator in Section 106(l) an authority to "fix the compensation of [FAA] officers and employees ..." and, through its subsection, "except as provided in subsection (g) of section 40122" providing for the applicability of "...chapter 71 [of Title 5], relating to labor-management relations," *excluded* from that authority the situation in which the FAA and labor organizations

8

representing Agency employees are engaged in collective bargaining over compensation pursuant to the CSRA .[3]

Accordingly, the grant of authority to the FAA Administrator in Section 106(*l*) to "fix the compensation of [FAA] officers and employees," by its terms, covers only the situation in which the Administrator can fix the compensation of FAA employees unilaterally and *not* the situation here in which compensation is a bargainable subject under the CSRA and is fixed bilaterally by collective bargaining between the FAA and labor organizations representing the Agency's employees governed by the CSRA.

The FAA's claim that the amendment to Section 106(*l*) had the effect of divesting the FSIP of its impasse-resolution jurisdiction over negotiation impasses in collective bargaining between the FAA and labor organizations representing the Agency's employees is defeated by the plain language of that statute -- Section 106(*l*) in terms disavows any intent to amend or to effect in any way the process of collective bargaining between the FAA and labor organizations representing the Agency's employees governed by the CSRA.

*       *       *       *       *

The gist of the matter is this:  the FAA's claim that 49 U.S.C. §§ 40122(a) and 106(*l*) implicitly divest the FSIP of the Panel's impasse-resolution jurisdiction in

---

[3] Compensation is a negotiable "condition of employment" under the CSRA, 5 U.S.C. § 7103(14), where, as here, the issue is not "specifically provided by Federal statute." Ft. Stewart Schools v. Federal Labor Relations Authority, 495 U.S. 641, 645-50 (1990); Department of Treasury, Bureau of Engraving and Printing v. Federal Labor Relations Authority, 995 F.2d 301, 302-304 (D.C. Cir. 1993), on remand 50 FLRA 677, 680-92 (1995), enf. mem. sub nom Bureau of Engraving & Printing v. FLRA, 88 F.3d 1297 (D.C. Cir. 1996); Dist. No. 1, PCD, MEBA and Panama Canal Comm., 26 FLRA 390, 394-96 (1987). NATCA and the FAA arrived at mutually acceptable collective bargaining agreements, inclusive of compensation issues, in 1998 and in 2003, and to extend their 2003 agreement to 2005, and did so without the need to invoke the FSIP's impasse-resolution jurisdiction.  Pl. St. ¶ 5.

collective bargaining between the FAA and labor organizations representing the Agency's employees fails under the rule of statutory construction that a later statute works to repeal an earlier statute only where the legislative intent to effect a repeal is "clear and manifest." National Association of Home Builders v. Defenders of Wildlife et al., ___U.S. ___, 127 S.Ct. 2518, 2532 (2007). As we have shown, Sections 40122(a) and 106(*l*), by their terms, reveal *no* intent to affect in any way the process of collective bargaining between the FAA and labor organizations representing the Agency's employees, as governed by the CSRA, much less a "clear and manifest" intention to divest the FSIP of its impasse-resolution jurisdiction over collective bargaining between the FAA and labor organizations representing the Agency's employees as provided for in the CSRA.

## CONCLUSION

For the foregoing reasons, NATCA urges the Court to enter declaratory judgment in its favor affirming the continuing applicability of the requirements of the CSRA to collective bargaining between the FAA and labor organizations representing the Agency's employees, including the impasse-resolution jurisdiction of the FSIP under 5 U.S.C. § 7119.

Respectfully submitted,

William W. Osborne, Jr.
D.C. Bar Identification No. 912089
Marie Louise Hagen
D.C. Bar Identification No. 412411
Osborne Law Offices, P.C.
4301 Connecticut Avenue, N.W.
Suite 108
Washington, D.C. 20008
(202) 243-3200

Marguerite L. Graf
D.C. Bar Identification No. 455693
General Counsel
National Air Traffic Controllers
Association, AFL-CIO
1325 Massachusetts Avenue, N.W.
Washington, D.C. 20005
(202) 628-5451
Counsel for Plaintiff

Dated: May 1, 2008

11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL AIR TRAFFIC CONTROLLERS ASSOCIATION, AFL-CIO, 1325 Massachusetts Ave, N.W. Washington, D.C. 20005, | : : : : : |
| Plaintiff, | : Civil Action No. <u>1:08-cv-00481</u> . : Assigned to Collyer, Rosemary M. |
| vs. | : Assign. Date: 3/21/2008 : Description: Admn. Agency Review |
| FEDERAL LABOR RELATIONS AUTHORITY, 1400 K Street, N.W. Washington, D.C. 20424, | : : : |
| FEDERAL SERVICE IMPASSES PANEL 1900 E Street, N.W. Washington, DC  20415, | : : : : |
| and | : : |
| UNITED STATES DEPARMENT OF TRANSPORTATION, FEDERAL AVIATION ADMINISTRATION 800 Independence Avenue, SW Washington, DC  20591, | : : : : : : |
| Defendants. | : : |

_____

## <u>CERTIFICATE OF SERVICE</u>

I certify that I served copies of the Plaintiff's Motion for Summary Judgment, Memorandum of Law, Statement of Material Facts, Declaration of Patrick Forrey, and Proposed Order on the defendants to this action by first-class mail addressed as follows:

Federal Labor Relations Authority
1400 K Street, N.W., Washington, D.C. 20424

Federal Services Impasse Panel
1400 K Street, N.W., Washington, D.C. 20424

United States Department of Transportation, Federal Aviation Administration
600 Independence Avenue, SW, Washington, D.C. 20591

Jeffrey A. Taylor, United States Attorney for the District of Columbia
501 3rd St, N.W., Washington, D.C. 20001

Honorable Michael B. Mukasey, U.S. Attorney General
950 Pennsylvania Avenue, N.W., Washington, D.C. 20530

   I certify under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

   Executed on May 1, 2008

            _____
            Marie Louise Hagen
            DC Bar No. 412411

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL AIR TRAFFIC CONTROLLERS       :
ASSOCIATION, AFL-CIO,                  :
1325 Massachusetts Ave, N.W.           :
Washington, D.C. 20005,                :
                                       :
            Plaintiff,    : Civil Action No. <u>1:08-cv-00481</u> .
                                       : Assigned to Collyer, Rosemary M.
  vs.                              : Assign. Date: 3/21/2008
                                       : Description: Admn. Agency Review
FEDERAL LABOR RELATIONS AUTHORITY,     :
1400 K Street, N.W.                    :
Washington, D.C. 20424,                :
                                       :
FEDERAL SERVICE IMPASSES PANEL         :
1900 E Street, N.W.                    :
Washington, DC   20415,                :
                                       :
and                                    :
                                       :
UNITED STATES DEPARMENT OF             :
TRANSPORTATION,                        :
FEDERAL AVIATION ADMINISTRATION        :
800 Independence Avenue, SW            :
Washington, DC   20591,                :
                                       :
           Defendants.   :
_____:

## <u>PROPOSED ORDER</u>

      This matter having come before the Court on Plaintiff's motion for summary

judgment and the Court, having considered the parties' submissions in support of and

in opposition thereto and the entire record herein, determines that the motion has

merit and should be granted.  It is therefore

      ORDERED that the Plaintiffs' motion for summary judgment is granted; it is

further

DECLARED that the requirements of the Civil Service Reform act apply to collective bargaining between the FAA and labor organizations representing FAA employees, including the impasse-resolution jurisdiction of the FSIP under 5 U.S.C. § 7119.


Dated: _____


_____
United States District Judge


Copies to All Counsel of Record

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL AIR TRAFFIC CONTROLLERS          :
ASSOCIATION, AFL-CIO,                      :
1325 Massachusetts Ave, N.W.              :
Washington, D.C. 20005,                   :
                                          :
        Plaintiff,                 : Civil Action No. 1:08-cv-00481 .
                                          : Assigned to Collyer, Rosemary M.
  vs.                                   : Assign. Date: 3/21/2008
                                          : Description: Admn. Agency Review
FEDERAL LABOR RELATIONS AUTHORITY,        :
1400 K Street, N.W.                        :
Washington, D.C. 20424,                    :
                                          :
FEDERAL SERVICE IMPASSES PANEL            :
1900 E Street, N.W.                        :
Washington, DC   20415,                    :
                                          :
and                                       :
                                          :
UNITED STATES DEPARMENT OF                :
TRANSPORTATION,                           :
FEDERAL AVIATION ADMINISTRATION           :
800 Independence Avenue, SW               :
Washington, DC   20591,                    :
                                          :
        Defendants.                :

## CERTIFICATE OF SERVICE

I certify that I served copies of the Plaintiff's Motion for Summary Judgment, Memorandum of Law, Statement of Material Facts, Declaration of Patrick Forrey, and Proposed Order on the defendants to this action by first-class mail addressed as follows:

Federal Labor Relations Authority
1400 K Street, N.W.
Washington, D.C. 20424

Federal Services Impasse Panel
1400 K Street, N.W.
Washington, D.C. 20424

United States Department of Transportation
Federal Aviation Administration
600 Independence Avenue
SW, Washington, D.C. 20591

Mr. Jeffrey A. Taylor
United States Attorney
    for the District of Columbia
501 3rd St, N.W.
Washington, D.C. 20001

Honorable Michael B. Mukasey
United States Attorney General
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

I certify under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on May 1, 2008

Marie Louise Hagen
DC Bar No. 412411

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL AIR TRAFFIC CONTROLLERS           :
ASSOCIATION, AFL-CIO,                       :
1325 Massachusetts Ave, N.W.                :
Washington, D.C. 20005,                     :
                                            :
          Plaintiff,     :      Civil Action No. 1:08-cv-00481 .
                                            :      Assigned to Collyer, Rosemary M.
vs.                                         :      Assign. Date: 3/21/2008
                                            :      Description: Admn. Agency Review
FEDERAL LABOR RELATIONS AUTHORITY, :
1400 K Street, N.W.                         :
Washington, D.C. 20424,                     :
                                            :
FEDERAL SERVICE IMPASSES PANEL              :
1900 E Street, N.W.                         :
Washington, DC   20415,                     :
                                            :
and                                         :
                                            :
UNITED STATES DEPARMENT OF                  :
TRANSPORTATION,                             :
FEDERAL AVIATION ADMINISTRATION             :
800 Independence Avenue, SW                 :
Washington, DC   20591,                     :
                                            :
          Defendants.    :

---

## DECLARATION OF PATRICK FORREY

Patrick Forrey declares as follows:

1.  I am the President of the National Air Traffic Controllers Association, AFL-CIO,

("NATCA"), and have served in that capacity since September 1, 2006.  Prior to my

election as President, I served as NATCA Great Lakes Regional Vice President from

September 1, 2000 through August 31, 2006; NATCA Facility Representative at the

Cleveland Air Route Traffic Control Center from 1991 through August 31, 2000; and

NATCA Area Representative at the Cleveland Air Route Traffic Control Center from 1989

through 1991. I make this declaration in support of NATCA's Motion for Summary

Judgment in this action, based on my personal knowledge and documents and

information available to me as President of NATCA.

2.      NATCA is a "labor organization" within the meaning of 5 U.S.C. §7103(a)(4)

with a membership of approximately 15,000 employees of the Federal Aviation

Administration ("FAA"). Pursuant to the representation processes of the Civil Service

Reform Act of 1978, 5 U.S.C. § 7101 *et seq.* ("CSRA"), NATCA has been certified as the

exclusive bargaining representative in numerous bargaining units of Federal Aviation

Administration employees, including the largest of such bargaining units inclusive of over

12,000 air traffic control specialists.

3.      Between 1987, the time of NATCA's initial certification by the Federal

Labor Relations Authority ("FLRA") as the exclusive representative of the FAA's air traffic

control specialists, and 2005, NATCA and the FAA successfully engaged in collective

bargaining negotiations and arrived at mutually acceptable collective bargaining

agreements in 1989, 1993, 1998, and the extension of the 1998 agreement in 2003

through September of 2005, including bargaining over compensation and benefit issues

in 1998 and thereafter, all without the need to utilize the impasse-resolution processes of

the Federal Service Impasses Panel ("FSIP"). *See* Exhibit A hereto, Memorandum of

Understanding With Respect to Reclassification and Associated Pay Rules Between

NATCA and The FAA.

4. Beginning In 2005 and continuing to date, the FAA has opposed NATCA's

invocation of the FSIP's impasse-resolution jurisdiction on the claim that Congress'

enactment of 49 U.S.C. §§ 40122(a) and 106(*l* ) respectively had the effect of implicitly

divesting the FSIP of its jurisdiction over collective bargaining negotiation impasses

between the FAA and labor organizations representing its employees.   Specifically, the

FAA has claimed that the process established by Congress in Section 40122(a) for

making "changes" to the FAA PMS governs the resolution of negotiation impasses in

collective bargaining as well and/or that the authority granted the FAA Administrator in

Section 106(*l* ) to "fix the compensation of ... [FAA] employees" had the effect of

divesting the FSIP of its impasse-resolution jurisdiction over that subject.

5. The FSIP has on two occasions refused to take jurisdiction over impasses

between the FAA and NATCA:

(a)  On July 8, 2003, NATCA invoked the FSIP's impasse-resolution jurisdiction

with regard to negotiation impasses in collective bargaining between NATCA and the

FAA for initial collective bargaining agreements covering eleven (11) non-air traffic

controller bargaining units represented by NATCA.  The FAA objected, and on January

9, 2004, the FSIP declined to exercise its jurisdiction over the impasses, and declined to

take a position on the merits of the jurisdictional issue, on the ground that "Congress'

intent in enacting [the] statutory provisions [cited by the FAA] is subject to conflicting

interpretations, [that] must be addressed in [and resolved by some other] appropriate

forum." *See* Exhibit B hereto.

(b)  On April 5, 2006, the FAA declared a negotiation impasse in the collective

bargaining between NATCA and the FAA for a successor collective bargaining

agreement covering the bargaining unit, inclusive of over 12,000 FAA air traffic control

specialists.  *See* Exhibit C hereto.  On April 7, 2006, NATCA invoked the impasse-resolution jurisdiction of the FSIP with regard to that negotiation impasse.  *See* Exhibit D hereto.  The FAA again objected and, on July 6, 2006, the FSIP again declined to exercise its jurisdiction over the impasse, and declined to take a position on the merits of the jurisdictional issue, on the ground that "Congress' intent in enacting [the] statutory provisions [cited by the FAA is] subject to conflicting interpretations, [that] must be addressed in [and resolved by some other] appropriate forum."  *See* Exhibit E hereto.

6. NATCA has twice attempted to cause the issue of the FSIP's impasse-resolution jurisdiction over negotiation impasses in the collective bargaining process between the FAA and NATCA to be presented to the FLRA, as directed by this Court and by the D.C. Circuit, but has been prevented from doing so:

(a)  On July 8, 2005, amended on July 14, 2005, NATCA filed FLRA unfair labor practice charges raising the FSIP jurisdictional issue against the FAA.  On September 29, 2006, those unfair labor practice charges were administratively dismissed by the FLRA's General Counsel, at the urging of the FAA and over NATCA's objections, on the basis of a unilateral settlement agreement between the FAA and the General Counsel. As a result of that settlement, the issue of the FSIP's impasse-resolution jurisdiction over negotiation impasses in collective bargaining between the FAA and labor organizations representing the Agency's employees was not and could not be presented to the FLRA.

(b)  On July 11, 2006, and again on September 6, 2006, NATCA filed FLRA unfair labor practice charges raising the FSIP jurisdictional issue against the FAA.  On July 25, 2007, NATCA's charges were administratively dismissed by the San Francisco Regional Office of the FLRA General Counsel, at the urging of the FAA and over NATCA's

1:08-cv-00481

objection. As a result of that dismissal, the issue of the FSIP's impasse-resolution

jurisdiction over negotiation impasses in collective bargaining between the FAA and

labor organizations representing the Agency's employees was not, and could not be,

presented to the FLRA *See* July 25, 2007 dismissal letter from the FLRA Regional

Office; January 29, 2008, affirmance of that dismissal by the General Counsel of the

FLRA and February 26, 2008, denial of NATCA's request for reconsideration of that

dismissal. *See* Exhibits F, G and H hereto.

     7.    I hereby certify that the annexed exhibits are true and accurate copies of

the following documents filed on NATCA's behalf with, or received by NATCA from, the

entities indicated:

| | |
|---|---|
| Exhibit A: | November 8, 1999, Memorandum of Understanding With Respect to Reclassification and Associated Pay Rules Between NATCA and The FAA |
| Exhibit B: | January 9, 2004, FSIP letter to the FAA and Counsel for NATCA |
| Exhibit C: | April 5, 2006, FAA Submission to Congress (Cover, Table of Contents, Executive Summary, and pp. 46-52) |
| Exhibit D: | April 7, 2006, NATCA request for assistance from the FSIP |
| Exhibit E: | July 6, 2006, FSIP letter to FAA and NATCA |
| Exhibit F: | July 25, 2007, FLRA San Francisco Regional Office letter to NATCA |
| Exhibit G: | January 29, 2008, FLRA General Counsel Order Denying Appeal |
| Exhibit H: | February 26, 2008, FLRA General Counsel Order Denying Motion for reconsideration |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 1, 2008

_____
Patrick Forrey



UNITED STATES
# FEDERAL SERVICE IMPASSES PANEL
WASHINGTON, DC 20424-0001
January 9, 2004



**VIA FACSIMILE TRANSMISSION**

Elizabeth J. Head, Esq.
Office of the Chief Counsel
Federal Aviation Administration
400 7th Street, SW., PL-200A
Washington, DC 20591

Mr. William W. Osborne, Jr.
Osborne Law Offices
4301 Connecticut Avenue, NW.
Suite 108
Washington, DC 20008

                RE:   Department of Transportation
                      Federal Aviation Administration
                      Washington, DC and
                      NATCA, AFL-CIO
                      Case No. 03 FSIP 144

Dear Ms. Head and Mr. Osborne:

After due consideration of the request for assistance in the above-referenced case, the Panel in accordance with its regulations, 5 C.F.R. § 2471.6(a)(1), declines to assert jurisdiction because it is unclear whether the Panel has the authority to resolve the parties' impasse.

Our investigation reveals, among other things, that the Employer alleges that the Panel "may not assert jurisdiction" over any of the Union's compensation-related proposals. In its view, although the parties are at impasse, 49 U.S.C. §§ 106 and 40122(a) govern how collective bargaining disputes between the Federal Aviation Administration (FAA) and its unions over compensation matters are to be resolved.[1]  In essence, on the basis of its interpretation

---

[1]   49 U.S.C. § 106 provides that, in fixing compensation and benefits of employees, the Administrator of the FAA:

> [S]hall not engage in any type of bargaining, except to the extent provided for in section 40122(a), nor shall the Administrator be bound by any requirement to establish such compensation or benefits at particular levels.

                      (continued...)

**Plaintiff's Motion for Summary Judgment**
**Forrey Declaration Exhibit B**
**1:08-cv-00481**

2

of the relevant statutory provisions, the Employer argues that Congress changed "business as usual" for labor-management relations at the FAA by substituting itself for the traditional role otherwise played by the Panel in resolving Federal sector impasses regarding these matters.  In addition, it cites certain statements made by the Union subsequent to the enactment of the relevant legislation which demonstrate that it recognized that the § 40122(a) procedure displaced the Panel as the forum for resolving disputes over compensation and related issues under the FAA's PMS. Finally, in its initial jurisdictional submission to the Panel on September 22, 2003, it also states that, in accordance with § 40122(a), "the Agency is currently preparing its submission to Congress and will submit the compensation issues in dispute . . . in a timely manner."

In its response, the Union contends that the Employer has failed to portray accurately the intentions of Congress when it enacted 49 U.S.C. § 40122.  In this regard, § 40122(g)(1) and (2)(C), state the following:

   (g) Personnel Management System. –

   ――――――――――――――――

   1/   (...continued)
   49 U.S.C. § 40122(a)(2) provides a procedure for resolving negotiation impasses between the Administrator and the FAA's exclusive bargaining representatives over the development of, and subsequent changes to, the personnel management system (PMS) initially implemented on April 1, 1996.  It states as follows:

      (2) Mediation. – If the Administrator does not reach an agreement under paragraph (1) with the exclusive bargaining representatives, the services of the Federal Mediation and Conciliation Service shall be used to attempt to reach such agreement. If the services of the Federal Mediation and Conciliation Service do not lead to an agreement, the Administrator's proposed changes to the personnel management system shall not take effect until 60 days have elapsed after the Administrator has transmitted the proposed change, along with the objections of the exclusive bargaining representatives to the change, and the reasons for such objections, to Congress.  The 60-day period shall not include any period during which Congress has adjourned *sine die*.

3

> (1) In general. – In consultation with the employees of the Administration and such non-governmental experts in personnel management systems as he may employ, and notwithstanding the provisions of title 5 and other Federal personnel laws, the Administrator shall develop and implement, not later than January 1, 1996, a personnel management system for the Administration that addresses the unique demands on the agency's workforce. Such a new system shall, at a minimum, provide for greater flexibility in the hiring, training, compensation, and location of personnel.
>
> (2) Applicability of title 5. – The provisions of title 5 shall not apply to the new personnel management system developed and implemented pursuant to paragraph (1), with the exception of –
>
> (C) chapter 71, relating to labor-management relations.

According to the Union, if Congress had intended what the Employer contends, it would have enacted § 40122(g)(2)(C) to preserve chapter 71 **except for section 7119** (which authorizes the Panel to provide assistance in resolving negotiation impasses between agencies and exclusive representatives), but it did not. In the Union's view, in enacting § 40122(a)(2), Congress intended to provide itself with ultimate authority only over "changes to the personnel management system," *i.e.*, the "new system" to be implemented "not later than January 1, 1996," and not to subsequent, recurring collective bargaining between the parties within the confines of that system. Hence, § 40122(g) leaves "the subsidiary issues of employee benefits and compensation to be resolved by the parties under 'chapter 71,' which includes the FSIP's processes.". Moreover, although the Employer is requesting the Panel to "abdicate" its statutory responsibility,

> neither the governing statute nor the FSIP's case law provide the Panel with the discretion to decline to resolve an existing bargaining impasse on an *ad hoc* basis where, as here, the statutory predicates for the FSIP's intervention are present.

The Panel has carefully examined the parties' positions regarding its jurisdiction over their impasse, including the applicable statutory provisions, and concludes that the Employer has raised arguable questions concerning whether the Panel has the authority to resolve collective bargaining disputes over the compensation and benefits of FAA's bargaining-unit employees. In our view, such

4

questions, which appear to involve determinations as to Congresses' intent in enacting statutory provisions subject to conflicting interpretations, must be addressed in an appropriate forum before the Panel commits its resources to assist the parties in resolving the merits of their impasse.[2/]

This determination to decline to assert jurisdiction is made without prejudice to the right of either party to file another request for assistance if the underlying threshold question is resolved in the appropriate forum consistent with the Union's interpretation of the applicable statutory provisions.

By direction of the Panel.

Sincerely yours,

H. Joseph Schimansky
Executive Director

---

[2/]  Contrary to the Union's contention, the Panel believes that it's determination to decline jurisdiction under the circumstances presented in this case is fully consistent with its authority under the Federal Service Labor-Management Relations Statute and its implementing regulations.

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit B
1:08-cv-00481

# Memorandum of Understanding
## With Respect To Reclassification And Associated Pay Rules Between The
## National Air Traffic Controllers Association
## And The
## Federal Aviation Administration

This agreement is made and entered into by the National Air Traffic Controllers Association (NATCA) and the Federal Aviation Administration (Agency) in matters of controller pay definitions, applications, and policies, in association with the ATC Facility Reclassification project.

This Agreement shall be read in conjunction with the Memorandum Of Understanding With Respect To Reclassification And Associated Pay Rules Between The National Air Traffic Controllers Association And The Federal Aviation Administration dated July 8th, 1998.

This Agreement is jointly developed to amend rule 45 of the Pay Rules MOU.

This agreement between the National Air Traffic Controllers' Association and the Federal Aviation Administration is approved this 8th day of November 1999.


Ronald E. Morgan
Director of Air Traffic
Federal Aviation Administration


Mike McNally
President, National Air Traffic Controllers Association
AFL-CIO

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit A
1:08-cv-00481

1 of 2

11/08/99 12:50 PM

**45. For Re-entrant returning from Leave without Pay:**

- Extended LWOP - Upon return from LWOP of more than one year (consecutive), CPC or Developmental Air Traffic Controllers' base pay shall be set at the same percentage of band in the receiving facility pay band as the employee attained at the facility immediately prior to the beginning of LWOP status. The employee will not be entitled to any SCI increases while in extended LWOP status.

  - For those employees who are converting into the ATC system for the first time and whose position immediately prior to LWOP was in a facility and who are returning to the bargaining unit from the FG system, set pay as follows:

    1) Identify the ATC level of the facility from which the employee began LWOP.
    2) Identify the employee's FG grade and step immediately prior to his/her LWOP. Multiply the FG step percentage (i.e., FG 14 step 5, where step 5 is 13.33%) by the minimum base pay of the ATC level of the facility from which the employee began LWOP.
    3) This will determine employee's pay and placement in ATC system at the level determined in (1) above.
    4) If an employee is returning to the same facility ATC level as determined in (1) above, place the employee in the new ATC level in the same percentage of band determined in(2) above **OR**
    5) If the employee returns to a facility whose ATC level is lower or higher than the facility level held prior to LWOP, set pay as though returning to the same level facility as in (1) above, then follow the transfer rules described in paragraph 51 (CPC Transfer) of the Reclassification and Associated Pay Rules MOU.

  - For those employees who are converting into the ATC system for the first time and whose position immediately prior to LWOP was not in a facility and who are returning to the bargaining unit from the FG system, set pay as follows:

    1) Identify the ATC level of the last facility where the former bargaining unit employee worked.
    2) Follow steps 2-4 to set pay.

- Limited LWOP - Upon return from LWOP of one year or less (consecutive), CPC or Developmental Air Traffic Controllers' base pay shall be set as though the employee never left the applicable pay band, accruing all OSI/SCI increases to which entitled.

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit A
1:08-cv-00481

11/08/99 12:50 PM

# PRINCIPAL MEMORANDUM OF AGREEMENT
## BETWEEN THE
## NATIONAL AIR TRAFFIC CONTROLLERS ASSOCIATION
## AND THE
## FEDERAL AVIATION ADMINISTRATION

This Memorandum Agreement is made and entered into by and between the National Air Traffic Controllers Association ("NATCA") and the Federal Aviation Administration ("Agency").

1. The Agency will establish the baseline for bargaining unit staffing at 15,000 FTE's for FY 1999, FY 2000, and FY 2001. In FY 2002, the bargaining unit staffing will be increased by 2% over FY 2001. In FY 2003 the bargaining unit staffing will be increased by 2% over FY 2002. The Agency will backfill in order to maintain these numbers when attrition, transfers, or promotions reduce the staffing below the agreed upon numbers:

    a. The Agency recognizes its obligations with respect to hiring from among all appropriate sources.

    b. Distribution of agreed upon staffing numbers shall be in accordance with the parties collective bargaining agreement.

    c. NATCA and the Agency agree that the staffing levels set forth in this paragraph are sufficient to operate the air traffic system safely and efficiently.

2. The Agency will, through supervisory attrition, move toward a controller to supervisor ratio from the current level to a ratio of 10 to 1.

3. Within ninety (90) days of the signing of this agreement, the parties will convene a work group to determine the feasibility of developing a "controller apprenticeship program." The work group will consider the efficiency that results from hiring locally in an apprenticeship position with a commitment of future promotion into the Air Traffic Controller ranks.

4. The parties agree, that at any facility which is in continuous operation, FG 2152 operational personnel, as that term is defined on the effective date of this MOU, shall not be authorized to work compressed and/or maxi-flex 9 and 10 hour days.

5. During the life of the Collective Bargaining Agreement, the Agency will provide an additional 200 million dollars, in total (excluding CIC and overtime pay and COLD "roll-up") to make adjustments in connection with the reclassification of the FAA Air Traffic Control facilities. The additional funds will be incorporated

- 2 -

as a part of the employees' total compensation and benefits, and will be allocated effective at the beginning of each Fiscal Year as follows:

> FY 1999 ..... 80 million dollars
> FY 2000 ..... 65 million dollars in addition to the 80 million dollars (totaling 145 million dollars)
> FY 2001 ..... 55 million dollars in addition to the 145 million dollars (totaling 200 million dollars)

a.     The parties understand, that programming changes are necessary in order to accommodate the new payroll system. The FAA Administrator commits that these programming changes will be given the highest possible priority by the appropriate agency staff and the new payroll system will be implemented as soon as possible. In the event the program changes are not complete prior to October 1, 1998, eighty million dollars will be applied retroactive to October 1, 1998.

b.     The parties have made a good faith effort to devise a new pay system consistent with the agreement on additional funds to be made available in each of the first three fiscal years of the life of the new collective bargaining agreement. The parties recognize, however, that certain variables are sufficiently complex that the fiscal year mark will likely not be met precisely. To account for this, and to ensure that the parties' agreement on new funds remains in tact, the Agency and NATCA agree as follows:

1)     On a monthly basis during the life of the Agreement, the Agency will monitor the amount of new money being expended to fund the new pay system. The Agency will promptly share all this information with NATCA.

2)     Six months into each fiscal year of the Agreement, the parties will calculate a projected "burn rate" to determine whether the new money being expended to finance the new system will meet, exceed or be less than the agreed-upon amount of new money.

3)     In the event that the projection shows that the amount of new money meets the agreed-upon figure, no adjustment will be made.

4)     In the event that the projection shows that the amount of new money will be less than the agreed-upon amount, the pay tables will be adjusted upward as quickly as possible to ensure that the applicable year's agreed-upon new monthly allocation will be met.

- 3 -

5)    In the event that the projection shows that the amount of new money will be greater than the agreed-upon amount, the pay tables will be adjusted downward as quickly as possible to ensure that the applicable year's agreed-upon new monthly allocation will not be exceeded.

6.    Upon the implementation of the new payroll system, the existing operational controller differential authorized under the Air Traffic Revitalization Act (ATRA) will be integrated into the employees' base pay at the rate of 4.1%.

7.    In addition to the increases in paragraph 5 above, bargaining unit employees shall also receive step pool raises and raises applicable to Federal Workers generally, while the terms of the collective bargaining agreement are in effect, as described in the parties MOU Reclassification Agreement.

8.    The parties agree, the Interim Incentive Pay (IIP) provisions will be replaced by a Cost of Living Differential (COLD). The present IIP allocation will be shifted to the COLD and any additional funds necessary to expand COLD will be deducted from the funds as referenced in Section 5 above.

9.    Unless otherwise referenced in the parties collective bargaining agreement, the Agency agrees to continue all premium pay and differentials, in the same percentage and under the same requirements as are currently in effect.

10.   Within ninety (90) days of the signing of this agreement, the parties will meet at the National Level to develop a plan for assumption of duties as outlined in Article 17 in the parties collective bargaining agreement. The parties will further explore the reduction of staff and training personnel and the absorption of staff and training functions into the bargaining unit.

11.   The parties recognize that, although this agreement is wholeheartedly endorsed by the FAA Administrator, the Secretary of Transportation, and the President and Executive Vice President of NATCA, it's terms and conditions are subject to congressional approval.

12.   This Principal Memorandum of Agreement must be read in conjunction with the Memorandum of Understanding With Respect to Reclassification and Associated Pay Rules. In the event of a conflict between this Principal Memorandum of Agreement and the Memorandum of Understanding With Respect to Reclassification and Associated Pay Rules, however, this Principal Memorandum of Agreement takes precedence and shall govern.

- 4 -

This agreement between the National Air Traffic Controllers Association and the Federal Aviation Administration is approved this 9th day of July, 1998.


Jane Garvey
Administrator
Federal Aviation Administration


Mike McNally
President National Air Traffic Controllers
Association, AFL-CIO

# MEMORANDUM OF UNDERSTANDING
## WITH RESPECT TO RECLASSIFICATION AND ASSOCIATED PAY RULES
### BETWEEN THE
## NATIONAL AIR TRAFFIC CONTROLLERS ASSOCIATION
### AND THE
## FEDERAL AVIATION ADMINISTRATION

This agreement is made and entered into by the National Air Traffic Controllers Association (NATCA) and the Federal Aviation Administration (Agency) in the matters of controller pay definitions, applications, and policies, in association with the ATC Facility Reclassification project.

This Memorandum of Understanding shall be read in conjunction with the Principal Memorandum of Agreement dated July _9_, 1998.

The parties agree that any new pay/reclassification issues that surface subsequent to the signing of this agreement will be mutually addressed and resolved.

This agreement between the National Air traffic Controllers' Association and the Federal Aviation Administration is approved this _8th_ day of _July_ 1998.


Raymond B. Thoman
Program Director, Labor and Employee Relations
Federal Aviation Administration


Mike McNally
President
National Air traffic Controllers' Association, AFL-CIO

1

# PAY AND RECLASSIFICATION RULES

**1. Organizational Success Increase (OSI).** The amount of OSI shall be the same as the rest of the Agency OR the government-wide general increase and 50% of the step pool, whichever is greater.

**2. Superior Contribution Increase (SCI).** The amount of the SCI will be 50% of the step pool plus the QSI Pool OR the same percentage as that identified for the rest of the Agency, whichever is greater.

**3. Step Pool.** Currently, the annual increase in the average controller pay rate resulting from step increases is 1.6%. However, since the average step increase is in effect for only six months during the fiscal year for which it becomes effective, the cost increase is 0.8% in that fiscal year. The step pool will be sufficient to provide a 1.6% increase in the average pay rate for all members of the bargaining unit.

**4. Pay Elements.** All elements of the OSI and the SCI are annual increases in addition to the $200 million settlement addressed in the NATCA /FAA contractual MOU.

**5. Quality Step Increase Pool.** The specific dollar amount (pool) that is reserved annually by the Agency for administration to the bargaining unit in recognition of specific events. This specific funding level for the new pay system will be determined by mutual agreement of the parties within 90 days of this agreement. This pool represents the second component of the SCI.

**6. January Pay Increase.** The OSI for the NATCA bargaining unit minus 0.8% (50% of the step pool) will be administered annually during the first full pay period in January of each fiscal year.

**7. April Pay Increase.** The SCI plus the remaining 0.8% of the OSI (50% of the step pool) will be administered annually during the first full pay period in April of each fiscal year.

**8. Annual Adjustment of Pay Bands.** The pay bands established for each ATC facility level will be increased by the January pay increase plus the deferred 0.8% for bargaining unit employees coincidental with the April pay increase. If the January pay increase places an individual bargaining unit member's pay above the maximum of the pay band, that individual will receive all increases to base pay as if he/she were within the band parameters. The resulting base pay will be used in calculating all differentials, premiums, retirement and appropriate pay benefits. If after the April increase and adjustment to base pay and the pay band, an individual's base pay is still above the maximum of the pay band, applicable rules for above band pay adjustment will apply (i.e., pay retention).

**9. COLA Pay/Post Differential.** Eligible bargaining unit members will continue to receive COLA Pay/Post Differential as defined by statute and as currently administered outside the contiguous 48 states.

**10. Locality Pay.** Eligible bargaining unit members will continue to receive locality pay and will have their locality pay increased annually consistent with government wide changes (Title 5) coincidental with the January pay increase.

**11. Cost of Living Differential (COLD)** is defined as a pay allowance that will be granted to certain members of the bargaining unit who are employed in recognized, independently defined high cost of living areas. The COLD pay element may be administered bi-weekly, or quarterly or annually in lump sum. Cold will be a percentage of base pay and will rise with increases in base pay.

**12. Premium Pay.** Bargaining unit members will continue to receive all Premium Pay percentages and differentials as are currently administered in connection with holidays, night differential, Sundays, COLA, Post Differentials, operational currency, on-the-job training, meal breaks and any other premiums/differentials in accordance with applicable laws, regulations, or the parties collective bargaining agreement.

**13. Overtime Pay.** Bargaining unit members will continue to receive Overtime Pay as defined by the negotiated agreement.

**14. Transition Pay Basis** is defined as the employee's current base pay plus applicable locality pay plus ATRA plus IIP/Demonstration Pay (if applicable).

**15. Target Base Pay** is defined as the pay figure used to determine the dollar amount of increase to base pay an employee will receive during the conversion from the FG pay schedule to the ATC pay system. Pay retention rules will apply from the time of initial conversion for those employees whose target base pay exceeds the maximum of the ATC level pay band to which assigned.

**16. Base Pay** is defined as the employee's ATC pay rate including applicable locality adjustment.

**17. The Classification Index (CI)** is defined as the numerical index derived from the classification formula that is used to determine the ATC facility level.

**18. The ATC Classification Level** is determined by the classification index and ATC level break points which establish associated pay bands within which individual facilities are assigned. Field ATC facility levels range from ATC-3 through ATC-12, with additional expansion levels available at ATC-13 and ATC-14.

**19. Certified Professional Controller (CPC).** This title applies exclusively to a civilian Air Traffic Control Specialist who is or has been facility certified in the terminal/en route air traffic control option in the Air Traffic Service, and who is currently engaged

exclusively in the separation and control of live air traffic in terminal/en route facilities in the Air Traffic Service. Once facility certified in the terminal/en route option within the Air Traffic Service, a controller retains the CPC title as long as he/she remains in or regains this ATC career status.

**20. Bargaining Unit.** Certified Professional Controllers are employees of the Air Traffic Service whose primary duty is the separation and control of live air traffic in terminal and enroute facilities. This includes all Developmental Controllers upon reporting to terminal/enroute facilities either upon successful completion of the FAA Academy or upon direct report after entry to the Air Traffic Service.

**21. Developmental Air Traffic Controller.** An air traffic controller in training at a field facility who has never been facility certified in the terminal/en route option in an air traffic control facility in the Air Traffic Service and therefore has never attained the Certified Professional Controller (CPC) level.

**22. A New Entrant** is an individual who has never been employed by the Air Traffic Service as an Air Traffic Control Specialist in the terminal/en route option.

**23. A New Hire** is an individual who has never held an appointment in the Federal government.

**24. Position Description** is a document describing the duties and responsibilities of the CPC and Developmental Controller/Trainee within a specific facility category. One generic CPC position description will be assigned to each category of air traffic control facility (8), and a separate position description for all Developmental Controllers (1) and New Hires/New Entrants (1). There are a total of 10 position descriptions for the bargaining unit air traffic control workforce.

**25. A Re-entrant** into the Terminal/En Route Option:
a.  CPC – an individual who is not currently employed as an Air Traffic Controller by the Air Traffic Service but was previously an FPL/CPC Air Traffic Controller in the in the Air Traffic Service terminal/en route option.
b.  Developmental Air traffic Controller – an individual who is not currently employed as an Air Traffic Controller by the Air Traffic Service, but was previously a developmental controller or a trainee in the Air Traffic Service, including those at the FAA Academy, in the terminal/en route option.

**26. MSS Positions:** Manager, Supervisor and Staff (MSS) level are being established for various categories of positions. These levels are referred to by an identifier of MSS-X. MSS-1 includes facility staff specialists and MSS-2 includes facility operational supervisors.

**27. A Promotion** is defined as:
   a. movement from Academy completion into the first developmental stage.
   b. movement from the final developmental stage into the CPC position.
   c. movement from the CPC position to a MSS-2 or higher position.

**Note - movement by a CPC to a higher level ATC facility, or by a CPC to a MSS-1 (facility) staff position is NOT considered a promotion but rather a transfer. See Transfer.**

**28. A Temporary Promotion** is defined as movement from a CPC to MSS-2 or higher position for a temporary period of time.

**29. A Demotion (not applicable within/from CPC career level)** is defined as movement from a MSS-2 position or higher into a CPC position.

**Note - movement to a lower level ATC facility, or out of a MSS-1 (facility) staff position to a CPC position is NOT considered a demotion: it is a transfer. See Transfer.**

**30. A Transfer** is defined as any movement of a CPC or Developmental Air Traffic Controller in the terminal/en route option to another CPC or Developmental Controller position at the same, lower or higher ATC facility level. This includes bids, swaps and internal placements. Movement between a CPC position and a MSS-1 staff position is a transfer, both inter and intra facility. There are five kinds of transfers:
   a. transfer to a higher level facility.
   b. voluntary transfer to a lower level facility.
   c. voluntary transfer to the same level facility.
   d. involuntary transfer to a lower level facility for performance.
   e. either voluntary or involuntary transfer to MSS-1 facility staff position.

**31. Unsuccessful Training.** The inability to successfully conclude an air traffic control training program in either a terminal or enroute facility in the Air Traffic Service. There are three (3) scenarios applicable to unsuccessful training:

   a. Developmental – initial certification attempt(s) at a terminal/enroute facility(s) with the purpose of attaining Certified Professional Controller status.
   b. CPC re-certification – the attempt by a Certified Professional Controller at a terminal/enroute facility to regain fully certified status due to a certification loss at his/her present facility. (e.g. medical disqualification, loss of currency, or performance).
   c. CPC certification – subsequent certification by a Certified Professional Controller upon reporting to a new terminal/enroute facility.

**32. Developmental Air Traffic Controller Training Stages.** Each terminal and enroute air traffic control facility shall contain from two to four training stages for Developmental Air Traffic Controllers dependent on the complexity and number of operating positions within the facility.

**Note – a work group will be assembled and tasked with identifying the specific training stages necessary for each category of ATC facility by ATC level.**

**33. Pay Retention** applies to eligible employees whose base pay exceeds the applicable pay band. When an employee is in retained pay status, he/she shall receive ½ of the OSI increase for which eligible until such time that the employee's base pay falls within the facility level pay band. The retained base pay shall be the basis for calculating all differentials, retirement and pay benefits. An employee in retained pay status shall receive any SCI increase for which he/she is eligible in a lump sum payment.

**34. ATC Facility Level Retention.** If an employee is assigned to a facility that is reclassified to a lower ATC level, base pay will be retained at the higher ATC level (including all OSI and SCI increases for which the employee is eligible) for two (2) years, beginning the first full pay period after the action is taken.
After two (2) years the employee's current base pay will be placed in the lower ATC facility level pay band. If the employee's current base pay exceeds the top of the new level pay band, the employee shall be in pay retention status. If during the two (2) year period the facility is reclassified to its original ATC facility level, there will be no change in the employee's base pay.

**Note – a voluntary transfer out of the facility during the two (2) year period negates ATC Facility Level Retention. Eligibility for ATC Facility Level Retention is based solely on the employee's position of record at the time of the reclassification of the facility.**

**35. CPC Conversion from the FG Pay Schedules to the ATC Pay Levels.** Effective October 1, 1998, the following steps will be taken to transition bargaining unit employees to the ATC pay system. It is understood that the pay targets established under these rules will not be changed unless required to accommodate distribution of the $200 million dollars as specified in paragraph 5 of the Principal MOA.

Step 1: Establish the percentage difference between each employee's current FG grade and step above the current FG grade step1 for their assigned facility (including locality).

Step 2: Multiply the minimum base pay of the assigned ATC level pay band by that percentage. Add that figure to the minimum of the pay band to establish each employees target base pay. If the employee's target base pay does not exceed their current base pay by a minimum of 9.1%, the employee's target base pay will be adjusted upward to meet this minimum.

Each employee's target base pay will be transitioned in three phases to reach the target base pay.

Year 1: Determine the first transitional base pay for each employee by:

a. Add 4.1% (ATRA) to each employees base pay (FG grade, step plus locality);
b. Add any applicable IIP and/or Pay Demonstration entitlement; then,
c. Subtract the transition base pay from the target base pay to determine the amount of increase in base pay to be apportioned over the three years of the transition. Determine the amount to be apportioned in each year by the following approximate percentages: Year 1    %, Year 2    %, Year 3    % (totaling 100%). Add the year one increment to the transition pay base to determine the year one base pay; and,
d. Add (a), (b) and (c) to determine the first transitional base pay, retroactive to October 1, 1998.

Year 2: Add the identified dollar amount (Year 1(c)) to employee's base pay in the first full pay period of fiscal year 2000.

Year 3: Add the identified dollar amount (Year 1(c)) to employee's base pay in the first full pay period of fiscal year 2001.

Appendix 1 of this MOU contains the pay table for this reclassification system.

Note:  The dollar amount of increase determined by year 1 (step c) above is a fixed dollar amount that will not change even if the employee transfers to a higher, lower or same ATC level facility during the transition to the target base pay period (3 years).

Note:  Facilities currently classified as Level 1, and that are scheduled to be contracted out by end of fiscal year 1998, will not be classified within the new ATC levels. Those facilities will be treated in accordance with current pay policies with the exception that their base pay will be increased by 5% in the first year.

36. Developmental Air Traffic Controllers Conversion from the FG Pay Schedules to the ATC Pay Levels. Upon transition from the FG pay system to the new ATC pay system, Developmental Air Traffic Controllers will receive the same percentage increase received by the step one FPL/CPC in the facility upon conversion. This figure will not exceed the total dollar increase received by the step one FPL/CPC. At this point the Developmental Air Traffic Controllers also merge into the defined facility training (stage) program and receive subsequent pay increases according to completion of these training stages.

37. OSI Distribution. Bargaining unit employees will receive a portion of the annual OSI increase to base pay effective the first full pay period in January of each fiscal year unless negotiated otherwise. All ATC bargaining unit employees base pay shall be adjusted upward by the greater amount of the following:

a. the Agency OSI (minus 0.8% to be administered in April of the same fiscal year); OR,

b. the General Increase (plus 0.8% to be administered in April of the same fiscal year).

All increases to base pay resultant from an OSI increase will be used in calculating all differentials, premiums, retirement and appropriate pay benefits.

**38. SCI Distribution.** The SCI annual pay adjustment will be effective the first pay period in April in each fiscal year, on the base pay in effect at that time. All ATC bargaining unit employees base pay shall be adjusted upward by the greater amount of the following:

a. no less than the same percentage as that identified for the rest of the Agency, OR,

b. 0.8% PLUS the QSI Pool distributed proportionally.

SCI increases that result in a change in base pay within an employee's pay band will be used in calculating all additional pay differentials, premiums, retirement and pay benefits. SCI pay increases that result in a base pay above the employee's pay band will be paid in a lump sum as follows:

a. employee's base pay will be adjusted to equal the highest possible (if necessary) pay level within the band, and then,

b. the employee will receive a lump sum payment for the remaining amount (or the entire amount if applicable) of SCI above the maximum base pay for the band.

Beginning the first fiscal year of the ATC pay system implementation and extending through the third fiscal year after implementation, all bargaining unit employees will receive an equal percentage SCI pay adjustment annually, as previously described. Within one year from the date of the signing of this agreement, a work team will be assembled to address SCI for years four and five of this agreement. The joint team consisting of FAA management and NATCA representatives will design a mutually agreed upon quality and efficiency metric for future payment of SCI.

**39. New Entrant/New Hire (Developmental Air Traffic Controllers).** This category includes the following types of employees:

1) Basic qualifications
2) Basic qualifications, high GPA
3) Pilot
4) Dispatcher
5) Other aviation specializations, i.e., ramp controller
6) Private industry controller
7) Military ATC (non terminal/en route, other)
8) CTI graduates

40. The starting salary for a newly hired ATC reporting to the Academy for training is as follows:

- **ATC-1A (Basic Qualifications)**           = 60% of ATC-3
- **ATC-1B (Specialized Qualifications)**     = 75% of ATC-3
- **ATC-2  Academy graduate equivalent**      = 85% of ATC-3

41. Pay for the developmental controller is set as follows:

- **ATC-2 Academy Graduate**                  = 85% of ATC-3

- Upon successful completion of the first developmental stage of training, the base rate of pay is set at 55% of the minimum CPC base pay of the facility to which assigned. In no case will the base pay be less than a 6.7% increase over the current base pay*
- Upon successful completion of the second stage of training, the base pay is set at 70% of the minimum CPC base pay of the facility to which assigned.  In no case will  base pay be less than a 6.7% increase over the current base pay*
- Upon successful completion of the third stage of training, the base pay is set at 85% of the minimum CPC base pay of the facility to which assigned.  In no case will the base pay be less than a 6.7% increase over the current base pay*
- Upon successful completion of all developmental stages of training and fully certifying on all operational positions, promotion to the CPC level of the facility is accomplished.  In no case will the base pay be less than a 6.7% increase over base pay*

**\*Note:  for facilities for which there are only two developmental training stages the employee's base pay is set at 70% of the minimum CPC base pay upon completion of the first stage of training, but in no case less than 6.7% higher than the previous base pay; where there is only one developmental stage, the base pay is set at 85% of the minimum of the CPC base pay upon completion of the first stage of training, but in no case less than 6.7% higher than previous base pay.**

42. Specialized categories of employment and pay:

- For a new entrant but not a new hire, i.e., current federal government employee not covered below, pay will be set at the minimum of the pay band of the ATC-3 or at the employee's current rate, not to exceed the top of the ATC-3 pay band, whichever is greater.

- Employees entering the bargaining unit at the ATC 3 minimum base pay:

    1) Military controllers from the terminal/en route environment
    2) Foreign air traffic controllers certified in the tower/en route option

- Employees entering the bargaining unit with pay set at the minimum of appropriate band; OR if current pay is higher, set at current pay not to exceed maximum of band.

    1) DOD 2152s
    2) FAA 2152s (i.e., Flight Service Specialists, other 2152s that do not meet any other definition for pay setting purposes)
    3) FAA Contract tower air traffic controllers

### 43. For Re-entrant CPCs:
- CPC re-entrant outside of Air Traffic Service: The starting salary for a CPC re-entrant will be set in the pay band appropriate for the ATC Level Facility to which assigned, but in no case will it be higher than the rate of pay held prior to leaving the Air Traffic Service, except to raise the pay to the minimum of the pay band. If former pay exceeds the top of the pay band to which assigned, pay will be set at no higher than the top of the band.

- CPC re-entrant within Air Traffic Service: For individuals within the Air Traffic Service, follow the appropriate voluntary transfer or voluntary demotion rules.

### 44. For Re-entrant Developmentals:
- Developmental re-entrant to lower level facility: The starting salary for a developmental re-entrant to a lower level facility will be set in the same developmental percentage attained prior to leaving the terminal/en route option. If the same developmental pay stage does not exist at the new facility, the employee's base pay is set at the lowest available developmental stage percentage of the facility's minimum base pay, not to exceed previous base pay.
- Developmental re-entrant to higher level facility: The employee's base pay is set at the previous base pay until such time as the employee successfully completes the developmental stage that results in a higher base pay.
- Developmental re-entrant to same level facility: The employee's pay is set at the same pay as when left, but no less than the current minimum base pay for the developmental stage attained prior to leaving the terminal/en route option.

### 45. For Re-entrant returning from Leave without Pay:
- Extended LWOP - Upon return from LWOP of more than one year (consecutive), CPC or Developmental Air Traffic Controllers' base pay shall be set according to reentrant pay rules.

- Limited LWOP - Upon return from LWOP of one year or less (consecutive), CPC or Developmental Air Traffic Controllers' base pay shall be set as though the employee never left the applicable pay band, accruing all OSI/SCI increases to which entitled.

### 46. For Permanent Promotion:
Upon promotion, a CPC shall receive pay at the appropriate MSS level percentage or an increase in pay of 6.7%, whichever is greater.

**47. For Temporary Promotion:**
In the event of a temporary promotion, pay shall be established at the appropriate MSS level percentage or 6.7% higher than current base pay, whichever is greater. Upon conclusion of the temporary promotion, pay shall be established as though the employee never left the bargaining unit pay band, accruing all OSI/SCI increases that would have otherwise occurred. Pay during a temporary promotion has no influence on permanent pay when returned to position of record, regardless of the duration of the temporary promotion.

**48. For Voluntary Demotion:**
When a non-bargaining unit employee requests or voluntarily accepts a CPC position, base pay is set in the new pay band at the same percentage above band as in the current position.

**Note - demotions are not applicable within or from the CPC career level.**
**Note - movement by a CPC to a lower level ATC facility, or by a CPC into or from a MSS-1 staff position is NOT considered a demotion but rather a transfer.**

**49. For Involuntary Demotion (no fault of the employee):**
When a non-bargaining unit employee is involuntarily demoted through no fault of the employee, pay is set at the same rate in the new, lower pay band. If the current base pay exceeds the maximum of the new pay band, the employee shall be placed in pay retention status and all future pay increases shall be made in accordance with applicable pay retention rules. These employees are eligible for priority consideration to the previous career level.

**Note - demotions are not applicable within or from the CPC career level.**
**Note - movement by a CPC to a lower level ATC facility, or by a CPC into or from a MSS-1 staff position is NOT considered a demotion but rather a transfer.**

**50. For Involuntary Demotion (cause/performance/conduct):**
When a non-bargaining unit employee is involuntary demoted for cause, performance or conduct, base pay is set in the new pay band at the same percentage above base pay that was held in the exiting position.

**Note - demotions are not applicable within or from the CPC career level.**
**Note - movement by a CPC to a lower level ATC facility, or by a CPC into or from a MSS-1 staff position is NOT considered a demotion but rather a transfer.**

**51. For CPC Transfer:**
Once a controller has achieved CPC status in the first terminal/en route facility, that status is permanent. For a CPC, pay is set as follows:

- Upon transfer to a higher ATC level facility, pay is increased to the minimum of the new pay band, or 6.7%, whichever is higher. One-half of the increase is paid upon

initial transfer to the new facility; the other one-half is paid when fully certified in the new facility.

- Upon voluntary transfer to a lower ATC level facility, base pay is set at the current base pay if that rate falls within the new pay band. If current base pay is higher than the top of the new band, base pay is capped by the top of the band.
- Upon involuntary transfer for performance, base pay is set at the current base pay if that rate falls within the new pay band. If current base pay is higher than the top of the new band, base pay is capped by the top of the band.
- Upon voluntary transfer to the same level facility, base pay is unchanged. This includes internal placement and mutual swaps.

**52. For Developmental Controller Transfer:**

- Upon voluntary transfer to a higher ATC level facility, base pay is unchanged. Future pay increases are made in accordance with successful progression through the developmental stages, with minimum pay increase being 6.7%.
- Upon voluntary transfer to a lower ATC level facility, pay is set in the same developmental stage percentage of the lower level facility's minimum base pay. If the same stage does not exist at the new facility, employee's pay is set at lowest available stage at the new facility.
- Upon transfer to the same level facility, base pay is unchanged.
- Involuntarily transfer to lower level facility for performance: same pay setting rule as voluntary transfer to lower level facility.

**53.** A Decrease in Facility Classification Level is defined as a change in the facility classification index (CI) below identified "buffers" that results in a reduction in associated facility pay level. Pay at the lower ATC pay-level is set at the same pay with pay retention (if necessary), and priority consideration to previous ATC level.

**54.** Increase in Facility Classification Level is defined as a change in the facility classification index (CI) above identified "breakpoints" that results in an increase in associated facility pay level. Pay at the higher ATC-pay level is set at the same percentage of band with a minimum of a 6.7% increase.

**55. PCS Relocation.** Within ninety (90) days from the signing of the agreement a joint NATCA/FAA workgroup will convene in order to address the mutual concerns of the Agency and the Union regarding the relocation of all bargaining unit employees.

**56. Freeze/Audit Process:** Immediately work will begin to develop transition rules around the classification freeze and audit processes. The parties shall aggressively pursue all final adjustments with the intent of having all facilities correctly classified when the reclassification system is implemented.



**Federal Aviation Administration**

# U.S. Department of Transportation
# Federal Aviation Administration

Submission to the United States Congress
Concerning the Agency's Collective Bargaining Proposal
to the National Air Traffic Controllers Association

April 5, 2006

# TABLE OF CONTENTS

<u>Title</u>                                                      <u>Page Number</u>

Executive Summary                                                 1

I.  Introduction                                                  7

II.  Statutory Background                                         8

    A.  The FAA Administrator Retains Final Authority to Set      8
       Pay and Benefits for All Employees Following Good Faith
       Bargaining and Review by Congress

    B.  History of Litigation Over the FAA's Unique Impasse       10
       Resolution Procedure

III.  Background                                                  11

    A.  Composition of the Bargaining Units Involved in           11
       the Present Negotiations

    B.  History of Negotiations                                   11

IV.  Negotiations Environment                                     13

    A.  FAA's Fiscal Situation                                   13

    B.  FAA's Bargaining Objectives: Reforming the               14
       Current Agreement

V.  Issues in Dispute: Changes to Compensation and               19
    Benefits

    A.  Agency Proposal to Establish New Air Traffic             19
       Specialized Pay Plan (ATSPP)

        1.  Overview                                              19
        2.  Summary of the Status Quo                             20
        3.  The Agency's Proposal                                 21
        4.  The Union's Proposals and the Agency's Response       23

| Title | Page Number |
|---|---|
| B. Annual Pay Increases | 25 |
| 1. Overview | 26 |
| 2. Summary of the Status Quo | 26 |
| a. The FAA's Core Compensation Plan – Non-Controllers | 26 |
| b. The Controllers' AT Pay Plan | 27 |
| 3. The Agency's Proposals | 29 |
| a. Proposed Changes in the Annual Organizational Success Increase (OSI) | 29 |
| b. Proposed Changes in the Annual Superior Contribution Increase (SCI) | 29 |
| c. Proposed Changes in Eligibility Criteria | 30 |
| d. Proposed Changes Regarding the Administration of Pay Increases | 30 |
| 4. The Union's Proposals and the Agency's Response | 31 |
| C. Pay Premiums | 33 |
| 1. Overview | 33 |
| 2. Controller Incentive Pay (CIP) | 33 |
| a. The Status Quo | 33 |
| b. The Agency's Proposal and the Union's Objections | 34 |
| 3. Controller-in-Charge (CIC) Premium | 35 |
| a. The Status Quo | 35 |
| b. The Agency's Proposal and the Union's Objections | 36 |
| D. Pay Setting and Pay Retention | 37 |
| 1. Overview | 37 |
| 2. Summary of the Status Quo | 38 |
| a. Pay Setting for Trainees | 38 |
| b. Pay Setting for Transfers | 39 |
| c. Pay Setting for Facility Upgrades | 40 |
| d. Pay Setting for Facility Downgrades and Pay Retention | 40 |

| Title | Page Number |
|---|---|
| 3. The Agency's Proposals | 41 |
|    a. Pay Setting for Trainees | 41 |
|    b. Pay Setting for Transferees | 42 |
|    c. Pay Setting for Facility Upgrades | 43 |
|    d. Pay Setting for Facility Downgrades and Pay Retention | 43 |
| 4. The Union's Proposal and the Agency's Response | 43 |
| E. Union Proposals for New Benefits and Other Changes to the Personnel Management System | 44 |
|    1. Annual Leave | 44 |
|    2. Child Care Subsidy | 44 |
|    3. Tuition for Dependent Children Outside the Continental U.S. | 45 |
|    4. Student Loan Repayment Program | 45 |
|    5. Convert NOTAM Specialists to the AT Pay Plan | 46 |
| VI. Issues in Dispute: Other Changes to the Personnel Management System | 46 |
| A. Annual Leave | 46 |
|    1. "Prime Time" Leave Periods | 47 |
|    2. Credit Hours to Cover for Denied Leave | 47 |
|    3. Procedures for Cancellation of Leave | 47 |
| B. Work Assignments | 48 |
| C. Holidays | 49 |
| D. Relief Breaks | 50 |
| E. Overtime | 51 |
|    1. Overtime for Union "Official Time" | 51 |
|    2. Cancellation of Overtime | 51 |
|    3. Guaranteed Minimum Overtime Pay | 52 |
| F. Dress Code | 52 |

| Title | Page Number |
|---|---|
| VII.  Other Issues in Dispute Not Part of This Submission | 53 |
|   A.  Prohibited Subjects of Bargaining | 53 |
|   B.  Permissive Subjects of Bargaining | 54 |
| VIII.  Conclusion | 54 |

Attachment: Relevant Statutes

Appendices

A.  Proposals in Dispute

1.  Agency Proposals
2.  Union Proposals

B.  Tentatively Agreed Upon (TAU'd) Articles

# Executive Summary

## Background

Congress enacted "personnel reform" for the Federal Aviation Administration (FAA) ten years ago, as part of the 1996 transportation appropriations act. The law required the Agency to put in place a new personnel system by April 1996. The purpose of the legislation was to enable the Agency to create a more flexible system that would give the FAA a greater ability to attract and retain highly qualified technical personnel at market-based rates. The reform was also intended to foster accountability by allowing the Agency to link employee pay to individual and Agency performance.

In 1996, as part of FAA reauthorization, the Agency's statute was amended explicitly to bar the Administrator from negotiating with labor unions over compensation and benefits, except under limited circumstances in which the Agency was making changes in the personnel system first put in place in April of that year. Even in such bargaining, the parties were directed by Congress to "use every reasonable effort to *find cost savings and to increase productivity*" for each bargaining unit. The same law also provided that in the event the negotiating parties reached impasse, then following federal mediation, the Administration could implement its proposal 60 days after submitting its proposal to Congress. (49 U.S.C. §§ 106(l) and 40122(a)).

As the Agency began to implement the new law, these provisions were liberally interpreted so as to allow the Agency to bargain over wages with each of its unions on an ongoing basis. In 1998, the FAA signed a long-term contract with the Agency's air traffic controllers. Despite promises that the agreement would cost just $200 million in increased compensation over its first three years, all of which would be offset by gains in efficiency, the contract actually cost many times that amount and the gains did not materialize. With the compounding effect of mandated annual increases, controller compensation has far outpaced the rest of the FAA as well as the private and public sectors as a whole. The contract also unwisely tied the Agency's hands on key management prerogatives (like scheduling and staffing levels) and imposed expensive and wasteful practices on the Agency.

The FAA and the National Air Traffic Controllers Association (NATCA) began negotiations to replace the current agreement in July 2005. In the meantime, all the key terms of the contract (including automatic pay hikes) continue as a result of an "evergreen" clause. Despite extensive negotiation over nine months, including four weeks of mediation with the Federal Mediation and Conciliation Service, the Parties failed to reach agreement on several proposed articles affecting the compensation and benefits, as well as work rules, for three NATCA bargaining units. Therefore, as required by law, the FAA is transmitting its proposals, along with NATCA's proposals and objections, to Congress.

## Compensation and benefits

As a result of the 1998 agreement, the average controller in fiscal year (FY) 2005 enjoyed a compensation package worth $165,900, including $113,600 in base salary and locality, $14,900 in premium pay, and $37,400 in benefits. This represents a 75% increase since that contract was put into effect, which has left controller compensation 42% higher than all other FAA employees, including aviation safety inspectors, airway technicians, test pilots, and other professionals. The escalation in controller compensation has resulted this year in more than 1,600 controllers making more in pay than each member of Congress. The cost of this escalation is huge: since the current contract took effect in 1998, faster pay growth for NATCA compared to the rest of the Agency has cost taxpayers some $1.8 billion cumulatively in extra compensation. Our annual payroll (personnel and benefits costs) for air traffic controllers jumped from $1.4 billion (1998) to $2.4 billion (2005). And as productivity gains bargained for in 1998 never materialized, controller labor costs per flight steadily rose from $83 to $131 by 2005.

Whether or not such dubious financial results could have been predicted, the Agency clearly cannot afford to keep the current contract going forward. We must make significant and meaningful change in the wage structure. The Agency's goal with its final proposal is to introduce a revamped pay system for air traffic controllers that is affordable given the Agency's financial outlook, links future pay increases explicitly to Agency and individual performance, and allows us to effectively recruit thousands of new hires to replace controllers retiring over the next several years.

In constructing a new pay system, we recognized that we needed to find a way to balance the legitimate interests of current employees while allowing the Agency to transition to a new, market-oriented pay system. That's why **our proposal preserves the salaries and benefits of all incumbent employees.** In fact, despite the Union's public relations claims,[1] we have never demanded salary cuts or reductions in the generous benefit package controllers get, even as the airline industry we serve has repeatedly reduced wages and benefits for all of its skilled professionals.[2]

---

[1] Unfortunately, a NATCA radio campaign grossly mischaracterizes the Agency's last offer, asserting that "the FAA wants to slash salaries up to 30 percent and then impose a 5-year pay freeze that would worsen the staffing crisis and could put safety at risk." This is patently false: Under our proposal no controller will take a salary cut, much less "30 percent."

[2] The Air Transport Association has calculated the reduction in total salaries and fringe benefits at the six largest domestic air carriers from 2001 to 2005 at $8.336 billion. (2001 was the peak compensation year for airlines.)

Specifically, under the Agency's final contract offer:

■ We will implement a new air traffic pay plan with salary bands that line up with the rest of the FAA workforce, while keeping existing controllers essentially whole no matter where they fall with respect to the bands. Our final offer – indeed, every offer we made in negotiations – explicitly "grandfathers" the annual salary (base and locality pay) of every controller to the extent it exceeds the new caps under the revised pay plan.[3] We believe this is a major concession on the Agency's part, as more than 56% of our current controller workforce already enjoys base salaries in excess of GS-14 maximums and in excess of the corresponding pay bands for FAA's senior managers.

■ The revised pay plan is designed to be attractive to potential new hires as well, who will be joining public service in the thousands over the next several years. The plan was derived by taking the pay system used to compensate most other FAA employees and structuring it to match the classification levels in the controllers' current system. The resulting pay scales are still generous. Under our proposal, the average controller hired in FY 2007 would have a base salary, including locality, of $84,200, after five years on the job. With premium pay, average annual cash compensation would be $93,400 and total compensation (including benefits), $127,600. We are confident that remuneration of new hires at these levels -- which will still be above the rest of the FAA workforce -- is more than adequate for recruitment and retention.

■ Our pay plan links future increases to <u>agency-wide and individual performance</u>, as is already the case for most of the FAA under our "core compensation" plan, the cornerstone of our personnel management system. We will no longer guarantee automatic increases above the civil service average even when the FAA fails to meet its performance objectives – as the current contract unwisely does. We will no longer raise the maximums in every pay band each year regardless of market data, as the current contract requires. These practices have created a growing pay inequity between controller salaries and those of other FAA employees – a gap that now stands at $48,700 per employee up from $18,700 in 1998.

■ Contrary to the Union's assertions, there is no "pay freeze" for anyone under the Agency offer. Controllers with salaries <u>above the pay band</u> will still receive locality increases in their salaries. They will also be eligible under the FAA's personnel management system for the two other primary annual increases, an organizational success increase (OSI) and a superior contribution increase (SCI). Like other employees, if they are above the bands, then they will receive lump sum cash awards equal to the full amount of any foregone agency-wide increase or individual merit

---

[3] When NATCA complains of our proposal "slashing salaries," they are apparently referring to the Agency's proposed reductions in nominal <u>pay bands</u> not actual compensation. Of course, reductions in these pay bands will have virtually no effect on the current workforce, who will be <u>grandfathered at their existing salaries</u>.

increase. The net result? Our projections show that over the proposed five-year term of the contract, the average current controller can expect an <u>increase</u> in salary and locality from $113,625 to $122,500 and in cash earnings (including premium pay and performance awards) from $128,600 to $139,900. Of course, existing employees with base pay below the new ceilings, as well as all new hires, will remain eligible to receive all annual increases as adjustments to their base pay.

■ Premium pay will be reduced modestly from current levels under the Agency's final proposal, which protects 82% of the average controller's premium earnings during the life of the contract. All controllers will continue to be eligible for overtime, holiday, Sunday, night differentials, and on the job training instructor pay (OJTI) at the existing rates. Controller Incentive Pay (CIP), an extra locality adjustment unique to the Air Traffic Organization, and only applicable to about a third of the controller workforce, will be phased out evenly over five years. The current CIP program has failed to accomplish its objective of providing incentives for hard-to-staff facilities, while costing taxpayers $29.5 million a year.[4] We will also discontinue one other premium that has produced little benefit for the taxpayer, Controller-in-Charge (CIC) pay. Both Congress and the Inspector General of the U.S. Department of Transportation have been highly critical of the CIP and CIC premium programs.

■ We will maintain <u>all</u> benefits currently provided to controllers, worth on average $37,000 a year – and more for controllers hired since 1986 when the Agency increased the annual retirement contribution rate for employees in the Federal Employees Retirement System (FERS), now at 23.1% of salary (about twice that of the rest of FERS participants). But in doing so, we could not accept NATCA's multiple demands for new, special perquisites that we don't provide to other FAA employees, including private school tuition for dependents outside of the continental U.S., a substantial child care subsidy, and up to $60,000 <u>per</u> controller in student loan repayments. Nor could we adopt the Union's proposal that controllers be allowed to "sell back" to the taxpayer all unused annual leave.

■ Pay rules that set pay for controllers will be reformed so that controllers' pay is commensurate with the level of work they are performing. The current rules that set pay when controllers are in training, when they voluntarily transfer between facilities, and when their facility's classification level is upgraded are designed to provide them with significant pay increases before they demonstrate their competence in different positions. When a facility's classification level is downgraded, the current rules allow for controllers to retain their higher pay even though they are doing less complex work. The Agency's proposals are designed to ensure that controller pay is commensurate with the level of work being performed.

---

[4] The CIP cost is for both the Air Traffic Control Specialist and Traffic Management Coordinator/Specialist bargaining units.

The Union's final proposal on pay and benefits did not meet the Congressional direction that the FAA replace automatic pay increases with a performance-based system. Nor does it address the Agency's pressing need to restore internal pay equity. While styling its last offer as a large "pay cut" that would have somehow "saved" the Agency $1.4 billion over five years, NATCA's actual proposal would perpetuate nearly all of the objectionable pay provisions (as well as several antiquated work rules) in the current agreement. This combination makes their proposal unaffordable to the taxpayer and unfair to the rest of the FAA's highly skilled and equal talented workforce.

The Union's proposal would not actually cut anyone's pay. Instead, the nominal pay band minimums would temporarily drop by less than 3 percent, and maximums by less than 10 percent, effectively keeping the rich pay scales almost where they are today.   The effect of this offer is to deprive the taxpayer of most of the benefits from bringing in new employees at more market-oriented rates.   In the meantime, payroll costs for all air traffic controllers would continue to rise.  Worse, after the term of the agreement, the Agency would return to the system of guaranteed pay hikes and automatic increases in salary bands – with no relation to performance – that already has cost taxpayers $1.86 billion more than would have been the case if controllers had simply received raises at the same rate as their peers in the rest of the Agency. And the gap between controllers and all other FAA employees would continue to increase dramatically under NATCA's demands.

Other changes in the personnel management system, including work rules

In an era in which demands on the system are growing while revenues per operation are shrinking, we must take advantage of every opportunity for greater productivity. Our final offer keeps intact most of the benefits of the current working environment that reflect the unique demands placed on air traffic controllers, while ending practices that simply increase taxpayer expense with no offsetting improvement. For these reasons, the Agency and NATCA reached impasse over FAA's proposal to modify archaic work rules that, in our judgment, have impeded the efficiency of our air traffic operations. This includes several contract provisions that decrease scheduling flexibility and needlessly increase overtime expenditures.

For example:

■  The current agreement severely limits the Agency's flexibility to decrease staffing levels on holidays when traffic declines from daily norms; thus, controllers who are scheduled to work such days receive double pay regardless of whether they are ultimately needed.

■  The agreement guarantees every controller (regardless of seniority) two consecutive weeks of vacation, usually during the height of the busy summer travel season; as a result, the Agency must pay overtime rates to fill out its daily schedule. NATCA not only wants to retain this entitlement, they would make it more expensive for the taxpayers. The Union's proposal would require the Agency to buy back any unused

annual leave that could "not be scheduled" to meet the controllers' vacation requests.

■ The current contract provides controllers a break every two hours <u>regardless</u> of workload, staffing, and traffic levels. The Agency has no objection to the idea of breaks at regular intervals, but breaks should be determined by supervisors based on the actual operational environment. Moreover, having such a hard and fast requirement in the contract has been the font of literally thousands of Union grievances. Controllers regularly file grievances if the Agency supervisor keeps the controller "on position" <u>one minute</u> over the two hour limit.

■ The current contract permits the Agency to assign tasks to controllers that have a reasonable relationship to air traffic control, such as developing new operational procedures. The Union's proposal, however, would eliminate this flexibility and preclude the Agency from assigning any duties to controllers that do not consist of the separation of aircraft. We believe that facility managers and supervisors must have the right to assign operational duties (or paid administrative tasks) as required for the efficiency of the National Airspace System.

The Agency was able to agree with the Union on many important issues during the course of extensive negotiations and mediation. Nonetheless, several fundamental issues remain unresolved. On the key economic issues, the Parties' competing offers are <u>not</u> close: a $600 million gap separates the offers over five years, and that number increases to $ 3.7 billion over ten years principally because NATCA's proposal would perpetuate the current pay system of excessively generous pay bands and <u>automatic, above-normal pay growth</u> after the initial term ends.

Our proposals are based solidly on a clear Congressional mandate to implement a personnel system that is both cost efficient and meets the unique needs of the Agency's workforce. To that end, the Agency has proposed to extend to the controller workforce a salary structure in which pay increases reflect both organizational and individual performance. At the same time, our proposal restores management's prerogatives and responsibilities with regard to directing FAA operations.

After careful consideration, the Agency concluded that the necessary cost savings and efficiencies would not be achieved by agreeing to the Union's proposal. In the end, as much as the FAA would have preferred to have reached a comprehensive agreement, the Parties have been unable to do so.    The Parties are at impasse.   Thus, under the process established in the Federal Aviation Act and discussed earlier, the FAA must submit both sides' proposals to Congress for a 60 day review before acting to implement the Agency's terms.

service for each year of loan repayments. The Union argues this benefit would help recruit or retain highly qualified personnel.

The Agency rejected this proposal. The Agency has not experienced any problems whatsoever in recruiting or in retaining controllers based on their student loan debt, which makes sense given that the job does not require expensive, professional degrees and is highly paid by most taxpayers' standards. Most of the training required of controllers is provided on-the-job and controllers are paid a small salary while receiving that training, either at the FAA Academy or at the facility where they are assigned.

### 5.    Convert NOTAM Specialists to the AT Pay Plan

The Union proposed placing NOTAM Specialists into the ATC-8 level pay band under the current AT Pay Plan.[51] Under the Union's proposal, NOTAM Specialists would be considered employees of the Air Traffic Control System Command Center, where they are currently located, for purposes of the Controller Incentive Pay (CIP) program. This would entitle them to an additional 4.6% increase to their base pay. The Agency objects to this proposal because the NOTAM Specialist bargaining unit is under the Multi-Unit Compensation Pay Plan implemented in 2005. Additionally, the Agency has proposed eliminating the CIP program for all employees.

## VI. Issues in Dispute: Other Changes to the Personnel Management System

The Agency proposed a number of other changes to its Personnel Management System that do not bear directly on compensation and benefits. These proposals dealt with annual leave; the duties assigned to controllers; controller staffing on holidays; relief breaks for controllers; overtime rules; and dress code for controllers. While there may be some cost savings from the Agency's proposed changes, their primary intent is to provide the FAA with much-needed flexibility in managing its complex and demanding operation. The Union opposed each of these changes and, in most cases, proposed continuing the *status quo*.

## A.    Annual Leave

The Parties disagree over three issues regarding annual leave (aside from the three new annual benefits the Union discussed in Section V.E.1 above). They are: 1) the continuation of a "prime time" leave periods at each facility with a guarantee of two weeks of consecutive vacation at the height of the busy summer travel season; 2) eligibility to earn credit hours to cover for another employee whose annual leave request

---

[51] The text of the Union's proposal is in Section 15 of Article 108, Pay Rules, located in Appendix A.

was denied; and 3) the work schedule of a controller who cancels annual leave.[52] The Agency's proposals on these issues are designed to give management greater flexibility managing the Agency's resources and would eliminate antiquated work rules. The Union's proposals are essentially, "more of the same."

### 1.    "Prime Time" Leave Periods

The current agreement provides that the Parties at each facility will negotiate "prime time" leave periods so as to allow all controllers a minimum of two consecutive or non-consecutive weeks of annual leave during the selected period(s). Prime time leave periods usually fall in the busy summer months – when airline travel peaks -- but can vary by area of the country based on local vacation preferences. Requiring management to schedule two weeks of annual leave for every controller during the prime time period(s) results in significant additional costs for the Agency because controllers must be brought in on overtime in order to cover for those who are taking their prime time annual leave.

The Agency has proposed eliminating the concept of prime time leave periods in order to regain flexibility over scheduling and staffing. The Agency proposal still allows controllers to schedule two consecutive or non-consecutive weeks of annual leave if they so desire, but the leave would have to be distributed by the workforce throughout the year, avoiding the need for constant overtime during the busiest air travel periods.

The Union proposed that the prime time leave period begin on Memorial Day and end on Labor Day each year, unless the Parties at the facility level mutually agree otherwise. The Union also proposed that if the Agency is not able to accommodate a controllers' request for two consecutive or non-consecutive weeks of leave, the controller be able to "sell back" the leave under the program Section V.E.1 above. The result of the Union's proposal is that all controllers at a facility would schedule two weeks of leave during the three busiest months, leaving the Agency short-staffed and requiring the use of overtime. This is an inappropriate expense.

### 2.    Credit Hours to Cover for Denied Leave

The Union proposed that if a controller's request for annual leave is denied, then another controller not scheduled to work could volunteer to earn credit hours to allow the first controller to take leave. For example, assume Mary wants to take eight hours of annual leave for her next shift, but the Agency cannot accommodate her request due to a lack of staffing. Under the Union's proposal, John, who is not scheduled to work the shift Mary wants to take off, can volunteer to earn credit hours for that shift, in effect working in place of Mary.

---

[52] The text of the Agency's and Union's proposals is in Article 24, Annual Leave, located in Appendix A.

The Agency did not agree to the Union's proposal because it effectively creates another "time off" liability for the Agency. Using the above example, if John works Mary's shift so she can take leave, he earns eight credit hours. The Agency still pays Mary but now also owes John eight hours of time off, creating a new debt of time off where one did not previously exist. The Agency already accrues significant overtime costs ensuring that controllers are allowed to take all of the annual leave they are entitled to in a year without creating additional demand.

### 3.    Procedures for Cancellation of Leave

The Union has proposed maintaining an arcane provision in the current contract allowing controllers to cancel leave at any time "unless operational requirements dictate or allow assignment to a different shift." Under this provision, a controller can simply appear for work on a shift for which he had scheduled time off and announce that he has changed his mind and is canceling his leave. The Agency must then allow him to work that shift regardless of whether he is needed or not. The Agency regularly uses overtime to replace controllers out on annual leave. When a controller cancels leave at the last minute, it is often too late to cancel his replacement's overtime shift, resulting in the Agency paying two controllers (one at the overtime rate of time and a half) when only one is needed operationally.

The Agency proposed allowing controllers to cancel annual leave at any time prior to the posting of the watch schedule, which is usually twenty-eight days in advance. Once the watch schedule has been posted, annual leave can only be cancelled with management's approval. If the Agency approves the cancellation of leave after the watch schedule has been posted, management would decide which shift the controller will be assigned. The Agency's proposal allows managers to more effectively utilize resources and avoids situations where the Agency is paying for two controllers when it only needs one.

### B.    Work Assignments

The Parties are in disagreement over one issue regarding work assignments.[53] The Agency proposed maintaining the current contract provision, which was included in 1998 as the basis for asserted productivity gains. The Agency view is that in assigning work to controllers (a statutory management right), the duties assigned need only have a reasonable relationship to the controller's official position description, including functions such as training, briefings, and quality assurance. The Union's proposed change would take away this flexibility. Under their proposal, FAA controllers could only be required to perform the duties literally as written into their official position description, which is to separate and control live air traffic; and that if the Agency wants them to do other work, it must first modify their position descriptions (or pay them more).

---

[53] The text of the Agency's and Union's proposals is in Article 17, Position Descriptions, located in Appendix A.

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit C
1:08-cv-00481

48

The Agency's proposal gives it the ability to use controllers to perform other air traffic control-related duties when they are not needed operationally, while the Union's mechanical limitation would result in controllers being paid for extensive periods of unproductive time.[54] Furthermore, the Agency is not proposing that controllers take on any duties that do not already perform.

### C.    Holidays

Another issue in dispute between the Parties is whether the Agency should be able to adjust holiday staffing levels to actual traffic on those days.[55] Traditionally, air traffic increases in days preceding and subsequent to a holiday, but is generally lower on the holiday itself, e.g. most people fly on the days before Thanksgiving Day, but very few fly on Thanksgiving Day. The Agency's proposal reserves for management the right to excuse controllers from working on a particular holiday if they won't be needed. In making this determination, Agency managers will consider previous year's statistics regarding air traffic at the particular facility and other forecasts. In the end, though, the Agency believes it should be able to decide the number of controllers necessary to perform the work available.

This issue has significant financial implications because controllers who actually work on a holiday are entitled to eight hours of <u>holiday pay</u> for their shift in addition to their regular pay for the shift. Controllers who are scheduled to work on a holiday but are excused are still paid – but they receive <u>regular pay</u> for that shift. Because the Agency effectively pays double time for working on a holiday, excusing excess personnel on holidays saves the taxpayer money, while leaving employees essentially whole.[56]   No one should be entitled to receive double pay for a day when their services are not required and for which they will otherwise receive normal pay. The Agency proposal is an appropriate way of lowering costs.

The Union proposed maintaining the existing rules, which to leads to wasteful staffing on holidays. Also, under their proposal, when making any determination to reduce controller staffing on a holiday, the Agency would have to undertake a cumbersome analysis of historical air traffic activity. The Union's proposal is designed to maximize controller compensation at taxpayer expense.

---

[54] The Agency is not proposing to eliminate controllers' relief breaks after working an operational position. It is proposing that after controllers have had a reasonable break and they are not currently needed in the control room, they perform other necessary air traffic control-related duties.

[55] The text of the Agency's and Union's proposals is in Article 28, Holidays, located in Appendix A.

[56] Neither the Agency nor the Union proposed changing how controllers who actually work on a holiday or how controllers who are excused from work on a holiday are compensated.

**D.    Relief Breaks**

The Agency and the Union are in disagreement on two issues with regard to relief breaks.[57] The first involves how long controllers work an operational position, i.e. controlling live air traffic, before receiving a relief break, and the second concerns who may approve a controller's absence from the facility during a work shift. The provision in the current agreement that addresses the length of time controllers should remain "on position" before receiving a relief break has caused numerous disagreements between the Parties over the years and generated literally tens of thousands of grievances by controllers.[58]

The Agency's proposal is designed to reflect its intent that controllers should not normally work more than two consecutive hours "on position," but in certain circumstances this may be unavoidable: "The Parties recognize that there may be times based on staffing and workload that employees will exceed two (2) consecutive hours on position. The Parties further recognize that not exceeding two (2) consecutive hours without a break away from operational areas is the mutual goal." The Union's proposal goes much further: "Unless staffing and workload do not permit, employees shall not be required to spend more than two (2) consecutive hours performing operational duties without a break away from operational areas." The Union's proposal perpetuates a misguided and costly assumption that unless a relief break is provided <u>exactly</u> every two hours – regardless of traffic levels or the operational environment – controllers must receive extra compensation.

The second dispute with regard to relief breaks involves who may allow a controller to leave the facility during his work shift. Controllers work a "straight" eight hour shift, which includes a paid thirty minute meal break, as opposed to most other FAA and federal employees who work an 8.5 hour shift, including an unpaid thirty minute meal break. The reason controllers work eight hours rather than 8.5 hours is that they are subject to immediate recall to operational duties. Because controllers are subject to recall, they are generally not allowed to leave the facility during their shift. The Agency's proposal reflects that: "Employees shall remain at the facility unless released by the Agency," i.e. by an appropriate FAA management official. The Union's proposal designates specific individuals who may permit a controller to leave the facility grounds while on duty, including a controller working as the Controller-in-Charge (CIC).

---

[57] The text of the Agency's and Union's proposals is in Article 33, Position Rotation and Relief Periods, located in Appendix A.

[58] The current contract provision states: "Unless operational requirements do not permit, employees shall not be required to spend more than two (2) consecutive hours performing operational duties without a break away from operational areas." This has been interpreted by many controllers as a guarantee that they will not be required to work more than two hours on position at a particular time, resulting in numerous grievances filed by controllers who worked just a few minutes over two hours on position.

Controllers are paid to spend all eight hours of their shift at the facility. If for some reason they should be allowed to leave the facility, Agency management should make that determination, not a fellow controller.

## E.    Overtime

The Parties disagreed on three issues regarding overtime: 1) payment of overtime for Union representatives on "official time;" 2) cancellation of overtime; and 3) guaranteed minimum overtime pay.[59] The Agency rejected the Union's proposals on these issues because they would result in increased costs and decreased management flexibility. The Agency's proposal would allow it to effectively staff its operation and control overtime costs.

### 1.    Overtime for Union "Official Time"

By statute, federal employees who also serve as union representatives may engage in labor relations activities while on duty, i.e. the government pays their salaries while they serve as union representatives. Time spent on such activities is known as "official time." Today, such activities count toward overtime eligibility. The Union proposes that for overtime purposes, "all hours in a paid status are considered hours of work," meaning that time spent by a controller serving as a NATCA representative would count towards the forty hours that trigger the payment of overtime -- even though the representative did no work for or at the request of the Agency.

For example, assume that a controller served as a NATCA representative for eight hours on Monday during his work week and spent the other thirty-two hours of the week controlling air traffic. If the Agency needed him to come into work on Saturday, he would be paid overtime for that day because he already "worked" forty hours that week, even though eight of those hours were consumed by union duties that the Agency has no control over.

The Agency proposed that for overtime purposes, "all hours in a paid leave status are considered hours of work," thereby excluding official time from the definition. This is consistent with the generous civil service norm of counting all time on paid leave (sick leave, annual leave, etc.) towards the forty hour requirement.

### 2.    Cancellation of Overtime

The Union has proposed keeping a restrictive work rule that prevents the Agency from canceling scheduled overtime in most circumstances unless there is a minimum of a full week's notice.

---

[59] The text of the Agency's and Union's proposals is in Article 38, Overtime, located in Appendix A. There is no dispute between the Parties as to the rate of pay controllers receive while working overtime.

The Agency's proposal reserves its right to cancel overtime without adhering to an arbitrarily long notice provision.   Precisely because of the "24/7" nature of air traffic operations, the current provision has been the subject of constant NATCA grievances. For example, assume a controller is attending an all-day training session next week and the Agency called in another controller on overtime to cover his shift. If the first controller's training session is cancelled the day before, the Agency cannot the cancel the second controller's overtime, resulting in the Agency paying for two controllers (one at the time and a half overtime rate) when only one is needed operationally. The Union's proposal increases the Agency's costs and decreases the Agency's flexibility in managing its resources.

### 3.    Guaranteed Minimum Overtime Pay

The Union proposed guaranteeing a minimum amount of overtime pay for controllers who work before or after their scheduled shift or are called in to work overtime on their regular day off. For controllers who work overtime before or after their shift, the Union's proposal guarantees three hours of pay at the controller's regular rate of pay (equivalent to two hours of overtime at time and a half). For a controller who works overtime on his regular day off, the Union's proposal guarantees twelve hours of pay at his regular rate of pay (equivalent to eight hours of overtime at time and a half).

The Agency does not support the idea of a guaranteed minimum for controllers who are called to work overtime just before or just after their regular shift. The Agency will pay the controller for the <u>actual amount of work</u> performed at the appropriate overtime rate. For controllers called in to work overtime on their regular day off, the Agency proposed guaranteeing at least two hours of work in recognition of the inconvenience caused to the controller by working on his day off. The Agency's proposal ensures that controllers are only paid overtime for the time they are actually needed to work.

### F.    Dress Code

The Parties could not reach agreement regarding dress code for controllers.[60] The Agency's Personnel Management System requires that all employees, "[m]aintain a clean and neat personal appearance to the maximum practicable extent during working hours. Employees are expected to dress appropriately in order to reflect the level of professionalism commensurate with their duties and responsibilities."[61]  Controllers are the highest-paid non-supervisory workforce in the FAA, earning more than engineers, architects, and accountants. They are responsible for a vital aspect of the Agency's safety mission. The Agency believes that the controller workforce should dress in a manner commensurate with their high pay levels and important duties and responsibilities of their profession.

---

[60] The text of the Agency's and Union's proposals is in Article 69, Dress Code, located in Appendix A.

[61] FAA Human Resource Policy Manual, ER-4.1, Standards of Conduct.

# National Air Traffic Controllers Association
**AFL-CIO**



April 7, 2006

**VIA HAND DELIVERY**

Mr. H. Joseph Schimansky
Executive Director
Federal Service Impasses Panel
1400 K Street, N.W.
Washington, D.C.  20424

RECEIVED
FSIP
APR -7 AM 8:48

           Re:    Request for Assistance with Negotiation
                 Impasse Between National Air Traffic
                 Controllers Association and Federal
                 Aviation Administration (Collective
                 Bargaining Agreement Covering Air Traffic
                 Controllers, Traffic Management
                 Coordinators, and NOTAM Specialists)

Dear Mr. Schimansky:

       Pursuant to 5 U.S.C. § 7119 and 5 C.F.R. §2471.1, the National Air Traffic
Controllers Association hereby formally requests the assistance of the Federal Service
Impasses Panel with the resolution of twelve issues on which NATCA and the Federal
Aviation Administration were unable to reach agreement during negotiations for a new
collective bargaining agreement covering the units of federal air traffic controllers, traffic
management coordinators, and NOTAM specialists represented by NATCA.  The FAA
declared an impasse in those negotiations on April 5, 2006.  Upon the Agency's
declaration of impasse, NATCA sent the Agency an acknowledgment of the Agency's
impasse declaration and formal notice of NATCA's intent to request the assistance of the
FSIP with the resolution of all outstanding issues (a copy of that letter is enclosed).

       Attached is a list of the twelve issues on which the parties did not reach
agreement.  Three of these issues are also the subjects of bad faith bargaining and/or
refusal to bargain unfair labor practice charges filed by the Union and currently pending
before the Federal Labor Relations Authority.  A copy of the Union's final proposal on
each of the twelve issues is included; a copy of the Agency's final proposal on ten of the
issues is also included (the Agency did not submit a proposal on two of the issues).  In
addition, the attached list contains the requisite information on the negotiation and
mediation sessions held and provides the names of the individuals authorized to act on
behalf of the parties as well as their contact information.

                          Plaintiff's Motion for Summary Judgment
                          Forrey Declaration Exhibit D
                          1:08-cv-00481

Request for Assistance in Air Traffic Controller Negotiations
April 7, 2006
Page 2

     Finally, you are no doubt aware that the issue of the Panel's jurisdiction to resolve negotiation impasses between the FAA and the unions that represent Agency employees was recently before the U.S. Court of Appeals for the District of Columbia Circuit.  In a decision issued on February 17, 2006, that court explicitly noted that, pursuant to the provisions of the Federal Service Labor-Management Relations Statute, the statutory obligation to bargain includes participation in proceedings before the Panel.  See NATCA v. FSIP, 437 F.3d 1256, 1265 (D.C. Cir. 2006).  It is NATCA's position that the current impasse is one governed by the federal labor relations statute and, as such, clearly within the purview of the Panel's jurisdiction.

     NATCA respectfully requests as immediate an investigation of this matter as possible and appreciates the Panel's assistance with the resolution of this matter.

                          Sincerely,

                          John Carr
                          National President

cc:    The Honorable Marion C. Blakey, Administrator
        Federal Aviation Administration



UNITED STATES
FEDERAL SERVICE IMPASSES PANEL
WASHINGTON, DC 20424—0001

July 6, 2006

**VIA FACSIMILE TRANSMISSION**

Mr. Michael S. Herlihy
Manager, Third Party Services
   Division (AHL-200)
Federal Aviation Administration
800 Independence Avenue, S.W.
Washington, DC  20591

Mr. Marc Shapiro
Director of Labor Relations
National Air Traffic Controllers
   Association
1325 Massachusetts Ave, N.W
Washington, DC  20005

RE:   Department of Transportation
      Federal Aviation Administration
      Washington, DC and
      NATCA, AFL-CIO
      Case No. 06 FSIP 64

Gentleman:

After due consideration of the request for assistance in the above-
referenced case, the Panel in accordance with its regulations, 5
C.F.R. § 2471.6(a)(1), declines to assert jurisdiction because it
is unclear whether the Panel has the authority to resolve the
parties' impasse.

The Panel has carefully examined the parties' positions regarding
its jurisdiction over their impasse, including the applicable
statutory provisions, and concludes that the Employer has raised
arguable questions concerning whether the Panel has the authority
to resolve collective bargaining disputes over changes to the FAA's
PMS, including the compensation and benefits of FAA's bargaining-
unit employees.  In our view, such questions, which appear to
involve determinations as to Congresses' intent in enacting
statutory provisions subject to conflicting interpretations, must
be addressed in an appropriate forum before the Panel commits its
resources to assist the parties in resolving the merits of their
impasse.[1]

---

1/   In reaching its determination, the Panel notes that it is not
     endorsing, either explicitly or implicitly, the Employer's

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit E
1:08-cv-00481

2

This determination to decline to assert jurisdiction is made without prejudice to the right of either party to file another request for assistance if the underlying threshold question is resolved in the appropriate forum consistent with the Union's interpretation of the applicable statutory provisions.

By direction of the Panel.

Sincerely yours,

*H. Joseph Schimansky*

H. Joseph Schimansky
Executive Director

interpretation of the statutory provisions in question.

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit E
1:08-cv-00481

UNITED STATES OF AMERICA
**FEDERAL LABOR RELATIONS AUTHORITY**
SAN FRANCISCO REGION
901 Market Street, Suite 220
San Francisco, California 94103-1791
(415) 356-5000 Fax:(415) 356-5017

July 25, 2007

Eugene Freedman, Policy Counsel
National Air Traffic Controllers Association
1325 Massachusetts Avenue, NW
Washington, DC 20005

Re:    Federal Aviation Administration
       Washington, D.C.
       Case No. WA-CA-06-0563

Dear Mr. Freedman:

The unfair labor practice charge in this case was filed with the Washington Regional Office on July 11, 2006 and was transferred to the San Francisco Regional Office on September 7, 2006. After investigation, consideration of the evidence and application of the law to the facts, issuance of a complaint is not warranted.

The charge alleges that since on or about April 7, 2006, the Federal Aviation Administration (FAA) refused to bargain under the auspices of the Federal Service Impasses Panel (FSIP) when at impasse in contract negotiations with the National Air Traffic Controllers Association (NATCA). This conduct is alleged to violate section 7116(a)(1) and (5) of the Federal Service Labor-Management Relations Statute (Statute). The FLRA has jurisdiction over the matters raised in this timely filed charge.

In 1996, Congress passed legislation which authorized FAA to change its personnel and procurement systems. Pub L. No. 104-264 (October 9, 1996).[1] While ultimately the legislation provided that the FAA personnel management system created under that legislation would be subject to Chapter 71 of Title 5 and that negotiations over proposed changes to the system shall take place, the legislation also provided a unique mechanism for the resolution of bargaining impasses. 49 U.S.C. § 40122(a)(1). Specifically, in § 40122(a)(2), the legislation provided that where the services of the Federal Mediation and Conciliation Service (FMCS) do not lead to an agreement, the Administrator's proposed changes to the personnel management system shall not take effect until 60 days have elapsed after the Administrator has transmitted the proposed change to Congress.

---

[1] The relevant sections are set out in full in Attachment A.

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit F
1:08-cv-00481

take effect until 60 days have elapsed after the Administrator has transmitted the proposed change to Congress.

In this case, the investigation revealed that for nearly 10 months in 2005 and 2006, FAA and NATCA were in negotiations over a successor to the 2003 agreement in their three nationwide air traffic bargaining units. During bargaining, the parties agreed on many issues but agreement was not reached on all matters and the groundrules specified that any agreement was tentative until a final agreement was consummated. The parties participated in six weeks of mediation conducted by FMCS. On March 31, 2006, the FMCS Commissioner released the parties from mediation. On April 5, 2006, FAA declared that the parties were at impasse.[2]

On April 5, 2006, pursuant to 49 U.S.C. §§ 40122(a)(1) and (2), FAA submitted its position on impasse to Congress as well as an explanation of NATCA's opposition to its position. On April 7, 2006, pursuant to 5 U.S.C. § 7119, NATCA sought the assistance of FSIP. FAA asserted that FSIP lacked jurisdiction in these matters, as Congress had provided FAA with a unique impasse resolution procedure set forth in § 40122(a)(1) and (2). On July 15, 2006, FSIP declined to assert jurisdiction over the parties' impasse, finding that under § 40122(a) it was unclear whether or not FSIP had jurisdiction to resolve the parties' impasse dispute.

Consistent with § 40122(a)(2), sixty days after submitting the matter to Congress, on June 5, 2006, FAA notified NATCA that its final contract proposal was in effect. NATCA then filed this charge, alleging that FAA had failed to bargain under the auspices of FSIP concerning the bargaining impasse.

Fairly construed, § 40122(a)(1) and (2) replaced the provisions under the Statute for resolution of impasses. While that section provides for bargaining under Chapter 71 of Title 5, it explicitly provides for the resolution of bargaining impasses under the scheme set forth in that section. Here, FAA submitted the dispute to Congress after impasse was reached in April 2006. When the 60 day period expired without Congressional action, FAA was free to implement the proposal that was submitted to Congress.

NATCA asserts that the resolution of bargaining impasses set forth in § 40122(a)(2) applies only to bargaining disputes over "compensation and benefits." In this regard, NATCA relies on 49 U.S.C. §106(l) which provides that "in fixing compensation and benefits of officers and employees, the Administrator shall not engage in any type of bargaining, except to the extent provided for in § 40122(a), nor shall the Administrator be bound by any requirement to establish such compensation and benefits at particular levels." NATCA contends that only bargaining over those matters is covered by § 40122(a)(2). NATCA further asserts that neither section precludes impasse resolution through FSIP, prior to any submission to Congress.

Contrary to NATCA's claim, the procedure set forth in § 40122(a)(2) is not limited to impasses involving "compensation and benefits." In this regard, while § 40122(a)(1) provides that negotiations must take place, the same subsection (a) provides for a specific and clear procedure

---

[2] NATCA's allegation that the parties were not at impasse on April 5, 2006 is addressed in the dismissal letter issued today in Case No. WA-CA-06-0366.

2

for the resolution of impasses. Further there is no differentiation between impasses over compensation and other bargaining topics. Accordingly, this procedure must apply to the entire dispute at impasse.

Therefore, FAA did not violate section 7116(a)(1) and (5) of the Statute by submitting the contract bargaining impasse to Congress. Based on the foregoing, this charge is dismissed.

An appeal may be filed by mail or by hand delivery with the Office of the General Counsel. Your appeal should include the Case Number (WA-CA-06-0563) and be addressed as follows:

> Federal Labor Relations Authority
> Office of the General Counsel
> 1400 K Street NW, Second Floor
> Attention: Appeals
> Washington DC 20424-0001

Whichever method you choose, please note that the last day for filing an appeal of the dismissal is August 27, 2007. This means that an appeal that is mailed must be postmarked, or an appeal must be hand delivered, no later than August 27, 2007. Please send a copy of your appeal to the Regional Director.

If you need more time to prepare your appeal, you may ask for an extension of time. Mail or hand deliver your request for an extension of time to the Office of the General Counsel at the address listed above. Because requests for an extension of time must be received at least five days before the date the appeal is due, any request for an extension of time in this case must be received at the above address no later than August 22, 2007.

The procedures, time limits and grounds for filing an appeal are contained in Volume 5 of the Code of Federal Regulations at section 2423.11(c)-(g), 5 C.F.R. § 2423.11(c)-(g). The regulations may be found at any FLRA Regional Office, public law library, some large general purpose libraries, Federal Personnel Offices and the Authority's Home Page internet site--www.FLRA.gov.

I have also enclosed a document which summarizes frequently-asked questions and answers regarding the Office of the General Counsel's unfair labor practice appeals process.

Sincerely,

Gerald M. Cole

Gerald M. Cole
Regional Director

Enclosures:    Questions and Answers About Appeals

3

cc:    Elizabeth J. Head, Esq.
Office of the Chief Counsel
Federal Aviation Administration
Labor and Personnel Division, AGC-30
600 Independence Avenue, SW, 1st Floor
Washington, DC 20591

Colleen Duffy Kiko, General Counsel
Office of the General Counsel
Federal Labor Relations Authority
1400 K Street, NW, 2nd Floor
Washington, D.C. 20424-0001

4

## ATTACHMENT A

In October 1996, Congress passed the Air Traffic Management System Performance Improvement Act of 1996, Title II, as part of the Federal Aviation Reauthorization Act of 1996. Pub. L. No. 104-264, 110 Stat. 3213 (Oct. 9, 1996).

Section 253, codified as 49 U.S.C. § 40122)(a), provides:

    (a)    In general.—

        (1) Consultation and negotiation.—In developing and making changes to the personnel management system initially implemented by the Administrator of the Federal Aviation Administration on April 1, 1996, the Administrator shall negotiate with the exclusive bargaining representatives of employees of the Administration certified under Section 7111 of title 5 and consult with other employees of the Administration.

    (2)    Mediation.—If the Administrator does not reach an agreement under paragraph (1) with the exclusive bargaining representatives, the services of the Federal Mediation and Conciliation Service shall be used to attempt to reach such agreement. If the services of the Federal Mediation and Conciliation Service do not lead to an agreement, the Administrator's proposed changes to the personnel management system shall not take effect until 60 days have elapsed after the Administrator has transmitted the proposed change, along with the objections of the exclusive bargaining representatives to the change, and the reasons for such objections, to Congress. The 60-day period shall not include any period during which Congress has adjourned sine die. 49 U.S.C. § 40122(a).

Section 225, codified as 49 U.S.C. §106(l), provides that, in fixing compensation and benefits:

    Except as provided in subsections (a) and (g) of section 40122 [49 U.S.C. §§40122], the Administrator is authorized, in the performance of the functions of the Administrator, to appoint, transfer, and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Administrator and the Administration. In fixing compensation and benefits of officers and employees, the Administrator shall not engage in any type of bargaining, except to the extent provided for in section 40122(a) [49 U.S.C. § 40122(a)], nor shall the Administrator be bound by any requirement to establish such compensation or benefits at particular levels.

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit F
1:08-cv-00481

UNITED STATES OF AMERICA
BEFORE THE FEDERAL LABOR RELATIONS AUTHORITY
OFFICE OF THE GENERAL COUNSEL

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
WASHINGTON, D.C.
     **Charged Party**

**and**                                       Case No. WA-CA-06-0648

NATIONAL AIR TRAFFIC CONTROLLERS
  ASSOCIATION, AFL-CIO
     **Charging Party**

### Order Denying Appeal

The Rules and Regulations (Regulations) of the Federal Labor Relations Authority (FLRA) provide that a "Charging Party may obtain review of the Regional Director's decision not to issue a complaint by filing an appeal with the General Counsel within 25 days after service of the Regional Director's decision." 5 C.F.R. § 2423.11(c).

The decision of the Regional Director not to issue a complaint was issued on July 25, 2007, and was served on the parties by mail. Accordingly, an appeal must be filed by August 27, 2007. (An additional five days is added to the time period if the decision is served by mail. *See* 5 C.F.R. § 2429.22). The appeal was filed on August 27, 2007; therefore, it is timely filed and is properly before the General Counsel for consideration.

The Regulations at 5 C.F.R. § 2423.11(e) provide the following grounds upon which the General Counsel may grant an appeal of a Regional Director's decision to dismiss an unfair labor practice charge: (1) the decision did not consider a material fact that would have resulted in issuance of complaint; (2) the decision is based on a finding of a material fact that is clearly erroneous; (3) the decision is based on an incorrect statement of the applicable rule of law; (4) there is no Authority precedent on the legal issue in the case; or (5) the manner in which the Region conducted the investigation has resulted in prejudicial error. *Id.* and 5 C.F.R. § 2423.11(f).

On appeal, the Charging Party alleged, among other things, that the Regional Director's decision is based on a finding of a material fact that is clearly erroneous and there is no Authority precedent on the legal issue in the case. In this regard, the Charging Party contended that the Regional Director erred in concluding that the parties were at impasse. The Charging Party alleged that the Regional Director erred in failing to find that the FSIP is the final and binding arbiter of impasses. The Charging Party also submitted that there is no Authority precedent that

concerns the interpretation of 49 U.S.C. § 40122, and that nowhere in subsection (a) does it provide that unilateral implementation is a substitute for final agreement similar to the FSIP.

This appeal has been carefully considered. The Regional Director's rationale for dismissing the charges is supported by the evidence of record. The appeal has failed to establish any ground for either reversing the Regional Director's decision or remanding the case for further investigation in accordance with 5 C.F.R. § 2423.11(e). The dismissal letter issued by the Regional Director constitutes the written statement of the reasons for not issuing a complaint as required by 5 U.S.C. § 7118(a)(1).

ORDERED:    For the foregoing reasons, the appeal is hereby DENIED.[*]


Date Issued: 1.29.2008                            _____
                                                 Colleen Duffy Kiko
                                                 General Counsel

---

[*] Federal courts lack jurisdiction to review a decision by the General Counsel of the FLRA denying an appeal of a decision not to issue a ULP complaint. *See, e.g., Patent Office Prof'l Ass'n v. FLRA*, 128 F.3d 751, 752 (D.C. Cir. 1998).

**Plaintiff's Motion for Summary Judgment**
**Forrey Declaration Exhibit G**
**1:08-cv-00481**

UNITED STATES OF AMERICA
BEFORE THE FEDERAL LABOR RELATIONS AUTHORITY
OFFICE OF THE GENERAL COUNSEL

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
WASHINGTON, D.C.
      Charged Party

and                                         Case No. WA-CA-06-0648

NATIONAL AIR TRAFFIC CONTROLLERS
  ASSOCIATION, AFL-CIO
      Charging Party

CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2008, I mailed the foregoing ORDER upon the interested parties in this action by placing a copy thereof, postage prepaid, in the U.S. Post Office mailbox at Washington, D.C., addressed as follows:

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**       **CERTIFIED NOS.**

Eugene R. Freedman, Esquire
Deputy General Counsel
National Air Traffic Controllers
  Association, AFL-CIO
1325 Massachusetts Avenue, N.W.
Washington, D.C. 20005                 Cert No. 7006 2760 0005 6476 6253

Elizabeth J. Head, Esquire
Office of the Chief Counsel
Federal Aviation Administration
Labor & Personnel Division, AGC-30
600 Independence Avenue, S.W., 1st Floor
Washington, D.C. 20591                 Cert No. 7006 2760 0005 6476 6260

**BY FAX**

Gerald M. Cole
Regional Director, San Francisco

Debra Watlington
Management Analyst

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit G
1:08-cv-00481

UNITED STATES OF AMERICA
BEFORE THE FEDERAL LABOR RELATIONS AUTHORITY
OFFICE OF THE GENERAL COUNSEL

DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
WASHINGTON, D.C.
    Charged Party

and                                       Case No. WA-CA-06-0563

NATIONAL AIR TRAFFIC CONTROLLERS
  ASSOCIATION, AFL-CIO
    Charging Party

### Order Denying Motion for Reconsideration

The Rules and Regulations of the Federal Labor Relations Authority at 5 C.F.R. § 2423.11(g) provide that a Charging Party may move for reconsideration of the General Counsel's final decision if it can establish extraordinary circumstances. Further, the Motion for Reconsideration must be filed within 10 days after the date on which the General Counsel's final decision is postmarked. The final General Counsel's Order denying the appeal was postmarked January 29, 2008. As the Charging Party's Motion for Reconsideration was filed on February 6, 2008, it was timely filed. *See* 5 C.F.R. § 2429.21 (the date of hand delivery is the filing date).

In determining whether extraordinary circumstances have been established, the General Counsel applies a similar standard to that set forth by the Authority in *U.S. Dep't of the Air Force, 375th Combat Support Group, Scott Air Force Base, Ill.*, 50 FLRA 84 (1995). Specifically, the General Counsel will not grant a Motion for Reconsideration unless the moving party establishes that: (1) an intervening court decision or change in the law affects dispositive issues; (2) evidence, information or an issue crucial to the decision was not considered by the General Counsel; or (3) the General Counsel made an error in material fact or law. A Motion for Reconsideration may not be used to reopen a case merely to reargue contentions previously advanced and already considered by the General Counsel.

The contentions asserted in the Motion for Reconsideration have been carefully considered. Nothing in the Motion for Reconsideration establishes extraordinary circumstances under the standard set forth above. Therefore, the Motion for Reconsideration is denied. This decision is final. 5 C.F.R. § 2423.11(g).

ORDERED:    For the foregoing reasons, the Motion for Reconsideration is hereby DENIED.[*]

Date Issued: **2·26·2008**

Colleen Duffy Kiko
General Counsel

---

[*] Federal courts lack jurisdiction to review a decision by the General Counsel of the FLRA denying an appeal of a decision not to issue a ULP complaint. *See, e.g., Patent Office Prof'l Ass'n v. FLRA*, 128 F.3d 751, 752 (D.C. Cir. 1998).

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit H
1:08-cv-00481

## UNITED STATES OF AMERICA
## BEFORE THE FEDERAL LABOR RELATIONS AUTHORITY
## OFFICE OF THE GENERAL COUNSEL

**DEPARTMENT OF TRANSPORTATION**
**FEDERAL AVIATION ADMINISTRATION**
**WASHINGTON, D.C.**
            **Charged Party**

**and**                                        **Case No. WA-CA-06-0563**

**NATIONAL AIR TRAFFIC CONTROLLERS**
  **ASSOCIATION, AFL-CIO**
      **Charging Party**

### CERTIFICATE OF SERVICE

I hereby certify that on February 26, 2008, I mailed the foregoing ORDER upon the interested parties in this action by placing a copy thereof, postage prepaid, in the U.S. Post Office mailbox at Washington, D.C., addressed as follows:

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**        **CERTIFIED NOS.**

Eugene R. Freedman, Esquire
Deputy General Counsel
National Air Traffic Controllers
  Association, AFL-CIO
1325 Massachusetts Avenue, N.W.
Washington, D.C. 20005                    **Cert No. 7006 2760 0005 6476 6710**

Elizabeth J. Head, Esquire
Office of the Chief Counsel
Federal Aviation Administration
Labor & Personnel Division, AGC-30
600 Independence Avenue, S.W., 1st Floor
Washington, D.C. 20591                    **Cert No. 7006 2760 0005 6476 6727**

**BY FAX**

Gerald M. Cole
Regional Director, San Francisco

Debra Watlington
Management Analyst

Plaintiff's Motion for Summary Judgment
Forrey Declaration Exhibit H
1:08-cv-00481